**COLUMBIA GAS TRANSMISSION CORPORATION, Appellant,**

v.

**NEW ULM GAS, LTD., Appellee.**

No. 01–92–01133–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 28, 1994.

Rehearing Overruled Oct. 27, 1994.

Thomas H. Lee, J. Eric Tohar, Houston, for appellant.

Tom Reavley, Ray Langenberg, Austin, Charley L. Smith, Bellville, for appellee.

Before HUTSON–DUNN, DUGGAN and ANDELL, JJ.

## OPINION

DUGGAN, Justice.

Columbia Gas Transmission Corporation (Columbia) appeals from a jury verdict in a

lawsuit for breach of contract and fraud brought by New Ulm Gas, Ltd. (New Ulm), in connection with Columbia's purchase of gas from New Ulm. We reverse and remand.

## The Facts

In the 1960s and 70s, Fred Fox acquired oil and gas leases covering approximately 7,000 acres in the New Ulm Field in Austin County. In the mid to late 1970s, Fox assigned these leases to oil companies, reserving an overriding royalty to himself. The working interests under the original leases eventually became the property of various other oil companies.

In 1985, Fox purchased the working interest in the part of the New Ulm Field referred to as the Blezinger Unit, from which all of the gas in controversy in this case was produced. Fox then formed New Ulm to drill a Blezinger well. The general partner of New Ulm is the Fred Fox Corporation, of which Fox is president and sole owner.

In 1986, Fox assigned his interest in the Blezinger Unit to New Ulm, reserving an overriding royalty to himself. New Ulm drilled the Blezinger well and sold the gas to Columbia.

The gas sale was effected by five separate identical contracts (collectively, "the contract"). The contract contained two different pricing provisions, embodied in sections 3.1.1 and 3.1.3, respectively. Columbia and New Ulm disagree on how these two sections should be interpreted.

During the period in controversy, section 3.1.1 prices were as low as $7.31 per MMBtu (a unit of measurement used in gas sales) and as high as $8.61. Section 3.1.3 prices were as low as $1.36 and as high as $1.90. Section 3.1.1 was the exclusive pricing provision through December 31, 1984. Section 3.1.3 could be invoked by either party "[a]t any time after December 31, 1984, and from time to time thereafter," but not before. The contracts neither expressly allow nor expressly forbid pricing under section 3.1.1 after section 3.1.3 has been invoked.

Section 3.1.3 is a "market out" provision, although, in the view of both Columbia and New Ulm's respective experts, not a typical one. It is a mechanism by which price renegotiation may be effected, and the price reset according to current market levels. The section could be used by either the buyer, Columbia, or the seller, New Ulm. Columbia argues that section 3.1.3 became the exclusive pricing provision after its initial invocation; New Ulm contends that pricing under section 3.1.1 was still available to New Ulm even after Columbia invoked section 3.1.3.

During the period in controversy, Columbia had a gas sales contract with five other sellers besides New Ulm: Amerada, Kaiser Francis, Amoco Production, Unocal, and Superior (succeeded by Mobil). Of these five sales contracts, two were identical to Columbia's contract with New Ulm, and three differed only in the numbering of their sections.

All of the gas sold by New Ulm to Columbia before January 1, 1985, had been priced according to section 3.1.1. On January 1, 1985, Columbia invoked section 3.1.3 via a "market out" letter. All pricing after that date was done according to section 3.1.3.

Columbia filed for bankruptcy on July 31, 1991. At the time of filing, Columbia had not paid for the gas it had taken from New Ulm in June and July of 1991. In the trial court, Columbia stipulated to liability for the payment for that gas, and states on appeal that "New Ulm is entitled to a judgment for that amount regardless of the outcome ... in this appeal."

Both parties moved for summary judgment, each asserting that the two provisions at issue are unambiguous and that their own interpretation of the two provisions is the only reasonable interpretation that could be made. The trial court denied both motions and submitted the question to the trier of fact, the jury.[1]

The jury agreed with New Ulm's contentions that Columbia's payment of section

---

1. Whether a contract is ambiguous is a question of law for the court. *Radx Corp. v. Demy*, 658 S.W.2d 298, 301 (Tex.App.—Houston [1st Dist.] 1983, no writ). However, when a contract *is* ambiguous, the question of the true meaning of the contract becomes one of fact. *Id.*

3.1.3 prices instead of section 3.1.1 prices constituted breach of contract and fraud, and awarded damages to New Ulm. It also awarded New Ulm attorney's fees.

### Columbia's Points of Error

### Points of Error One, Two, and Three

Columbia brings eight points of error. It argues the first three together.

In point of error one, Columbia asserts that the trial court erred "in failing to hold, as a matter of law, that, under the unambiguous terms of the contract," Columbia's invocation of section 3.1.3 precluded New Ulm from receiving a section 3.1.1 price for its gas. In point of error two, Columbia contends that the trial court erred in failing to grant its motion for judgment notwithstanding the jury's finding that Columbia breached its contract with New Ulm, "because, as a matter of law, under the unambiguous terms of the contract," Columbia's invocation of section 3.1.3 precluded New Ulm from receiving a section 3.1.1 price for its gas. In point of error three, Columbia argues that the trial court erred in failing to grant its motion for judgment notwithstanding the jury's finding that Columbia committed fraud, "because, as a matter of law, under the unambiguous terms of the contract," Columbia's invocation of section 3.1.3 precluded New Ulm from receiving a section 3.1.1 price for its gas.

In essence, Columbia contends that, because it had a right under the contract to pay section 3.1.3 prices rather than section 3.1.1 prices, it could not have committed breach of contract or fraud in paying section 3.1.3 prices. Were Columbia to prevail on these points, it would be entitled to a reversal and a rendering of judgment in its favor, because if Columbia's invocation of section 3.1.3 precluded New Ulm from receiving a section 3.1.1 price for its gas, then indeed there could be no breach of contract or fraud in Columbia's not paying a section 3.1.1 price.

The parties agree that, for Columbia to prevail on any of its first three points, it must show that the contract was unambiguous, and that its interpretation is the correct interpretation.

### 1. Is the contract ambiguous?

As noted above, the question of whether a contract is ambiguous is a question of law. *Radx Corp.,* 658 S.W.2d at 301. "The primary concern is to ascertain and give effect to the intentions of the parties as expressed in the instrument." *Id.*

■ If the contract is worded such that a court may properly give it a certain or definite legal meaning or interpretation, it is not ambiguous. *Radx Corp.,* 658 S.W.2d at 301. A contract is ambiguous, however, where there is genuine uncertainty about which of two meanings is proper. *Id.*

The contract provisions at issue here are as follows:

*SECTION 3. PRICE*

The price to be paid by Buyer to Seller for all gas delivered hereunder, or made available and not taken as herein provided, shall be as follows:

3.1.1 For gas produced, sold and delivered hereunder, or any portion thereof, which the United States Congress, the Federal Energy Regulatory Commission, or any governmental authority having jurisdiction in the premises, ceases or has already ceased to have jurisdiction or exercise control over rates that may be lawfully charged and collected (hereinafter referred to as "deregulated gas"):

(i) Subject to Section 3.1.1(ii) hereof, the initial price shall be Five Dollars and Thirty–Five Cents ($5.35) per MMBtu effective June 1, 1980, and shall be adjusted on the first day of each month thereafter in the manner provided below based on the Consumer Price Index for all Urban Consumers and published by the U.S. Department of Labor, Bureau of Labor Statistics. The adjustment shall be determined by multiplying the price in effect during the immediately preceding month by a ratio, the numerator of which is said Index for the third preceding month, and the denominator of which is said Index for the fourth preceding month. The price per MMBtu applicable to any month shall be computed to the nearest one-thousandth of a dollar.

(ii) Seller may request a determination of an alternate price to be paid by Buyer hereunder to be effective on the first day of each calendar quarter and shall remain in effect thereafter until Seller requests a different alternate price. Such request for determination of an alternate price shall be made to Buyer in writing within fifteen (15) days prior to the beginning of the calendar quarter for which such alternate price will be effective and shall designate Seller's election of the alternate price; provided, however, Seller may request a determination of an alternate price within fifteen (15) days following execution of this contract, said alternate price to be effective from execution hereof until Seller requests a different alternate price. The alternate price shall be selected by Seller from the following alternatives:

(1) the price per MMBtu determined in accordance with the provisions of Section 3.1.1(i) above, said price to escalate monthly as provided therein; or

(2) the price per MMBtu equivalent to one hundred and ten percent (110%) of the price per MMBtu of Fuel Oil No. 2 computed to the nearest one-thousandth of a dollar which price shall be effective for a calendar quarter and determined in the manner provided below:

The price per gallon for Fuel Oil No. 2 shall be the arithmetic average for the last month of the calendar quarter preceding the calendar quarter for which the price is to be determined, of the daily average of the high price and low price of Fuel Oil No. 2 published by Platt's Oilgram—New York edition under the heading "South and East Terminals New York Harbor" for such month. For use in converting the price per gallon of Fuel Oil No. 2 to a price per MMBtu each gallon shall be deemed to contain 0.1387 MMBtu's.

In the event the prices of Fuel Oil No. 2 cease to be published in Platt's Oilgram in the manner contemplated, Buyer and Seller shall by mutual agreement choose a new index or indices of reference, or in the event no other index for such element shall be published, the parties shall agree upon a replacement for such element. In the event Buyer and Seller shall not have mutually agreed in writing upon a new index or indices, or a new element, as the case may be, by the end of the calendar quarter next following the calendar quarter for which the selection of a new index or indices or element becomes necessary in accordance with this Section 3.1.1(ii)2, the matter will be settled by arbitration as provided in Section 17; or

(3) a price per MMBtu equal to the arithmetic average of the three highest prices per MMBtu, excluding tax reimbursement and any production related costs, then being paid by separate interstate pipeline companies to gas producers not affiliated with such pipeline companies for deregulated gas delivered during the calendar quarter preceding the calendar quarter for which the price is to be determined. The contracts to be used in determining such three highest prices shall be limited to contracts for the purchase of gas produced within the State of Texas, to contracts for the purchase of gas of substantially the same or lesser quantity and the same quality and delivered under comparable conditions, and to contracts containing terms of not less than three (3) years but excluding any purchases of gas at prices authorized after the filing of petition for relief from ceiling price limitations made by the seller of such gas. The arithmetic average of such three highest prices, together with supporting calculations and data, and copies of the contracts, if available to Seller, or, in lieu thereof, other documented evidence of such contracts satisfactory to Buyer utilized by Seller in calculating such average price, shall be furnished to Buyer during the first twenty (20) days of the first month of each calendar quarter for which this method of determining the price is to apply. If the information set forth in the preceding sentence is not timely received by Buyer, the price payable hereunder during such calendar quarter shall

be the price provided for in Section 3.1.3(ii)(2) above; or

(4) a price per MMBtu equal to the arithmetic average of the two (2) highest prices per MMBtu (one from contracts with each Mexico and Canada) contracted for and paid during the last month of the calendar quarter preceding the calendar quarter for which the price is to be determined hereunder, which prices shall have been approved by the United States Congress, Federal Energy Regulatory Commission or other United States authority having jurisdiction.

. . . .

3.1.3 At any time after December 31, 1984 and from time to time thereafter, either Buyer or Seller may request the renegotiation of price to be paid for the gas sold and delivered hereunder, in which case the party making such request must demonstrate in good faith that the price being paid does not reflect the market value of the gas being sold in the area where it is produced or the market value of the gas in the area where it is being consumed. In such case the parties shall review the circumstances and supporting data in a good faith effort to rectify the situation by mutually agreeing to a new price or Seller may seek a third party purchaser for the gas. In the event that a bona fide offer is received by Seller from a third party purchaser, Buyer shall have the option either to match such offer and continue to purchase the gas hereunder or to release the gas at issue. If no bona fide third party purchaser offer is received then the parties hereto shall try for thirty (30) days to negotiate an acceptable price. If the parties fail to agree on a price, the matter will be referred to arbitration as provided in Section 17 hereunder. During the period of any negotiations or arbitration the gas will continue to be sold and purchased at the price in effect at the time of the notice.

The issue of ambiguity emerges when the contract is reviewed in order to determine whether the price of gas for the period in dispute, September, 1986, through July, 1991, should be determined by New Ulm's price selections under section 3.1.1 or Columbia's price selections under section 3.1.3.

It is clear, and the parties do not dispute, that section 3.1.3 could not have applied before January 1, 1985. That section begins with the words, "At any time after December 31, 1984 and from time to time thereafter. . . ." Therefore, before January 1, 1985, pricing was set according to, and could only have been set according to, section 3.1.1.

However, it is not clear whether section 3.1.1 could be used to set pricing after December 31, 1984, i.e., after section 3.1.3 was invoked by Columbia. The contract does not state that pricing can no longer be determined under section 3.1.1 once section 3.1.3 is invoked; neither does it state the contrary, that once section 3.1.3 is invoked, pricing can still be determined under section 3.1.1.

Section 3.1.1(ii) states that "Seller may request a determination of an alternate price to be paid by buyer hereunder to be effective on the first day of each calendar quarter and shall remain in effect thereafter until Seller requests a different alternate price." We note the language stating that the alternate price requested by the seller "shall remain in effect thereafter until Seller requests a different alternate price." This language alone directly conflicts with section 3.1.3, which, by its own terms, may be used to set pricing "[a]t any time after December 31, 1984[.]" If the alternate price selected by the seller under section 3.1.1 "shall remain in effect thereafter," then section 3.1.3 could never be used by the buyer, one of the two parties for whose benefit it was written.

On the other hand, if the language "[a]t any time after December 31, 1984" found in section 3.1.3 is intended to apply section 3.1.3 pricing at all times after that date, then section 3.1.1 could never be used after December 31, 1984, once section 3.1.3 is invoked. Again, the contract language is silent regarding whether this effect was intended.

One of Columbia's witnesses, a contract drafter, testified consistent with this interpretation. He asserted that once a party had "marketed out" and invoked section 3.1.3, then section 3.1.1 in effect becomes moot.

New Ulm's expert, however, testified that the opposite interpretation is correct. He stated that there is "nothing in the contract which prevents the seller from making an election under 3.1.1 after 3.1.3 has been elected."

## 2. Resolution

█ It is unclear to us whether section 3.1.1 can be used to determine pricing after section 3.1.3 is invoked. The language is capable of more than one meaning; it is capable of two meanings which are directly opposed. Under one construction, a price selected under section 3.1.1 would remain in effect for the life of the contract, rendering section 3.1.3 useless on the matter. Under the other construction, section 3.1.1 could never be used after December 31, 1984, once section 3.1.3 is invoked by a party, because only section 3.1.3 pricing could be used after a post-December 31, 1984, invocation. Because which meaning is "proper," i.e., which gives effect to the true intentions of the parties, is uncertain, we hold that the contract is ambiguous. *See Radx Corp.*, 658 S.W.2d at 301.

Columbia's first point of error asserts that the trial court erred "in failing to hold, as a matter of law, that, under the unambiguous terms of the contract," Columbia's invocation of section 3.1.3 precluded New Ulm from receiving a section 3.1.1 price for its gas. We have held that the contract is ambiguous, and thus that the issue of its true meaning was properly submitted to the trier of fact. We therefore overrule point of error one.

Columbia's second point of error asserts that the trial court erred in failing to grant its motion for judgment notwithstanding the jury's finding that Columbia breached its contract with New Ulm, "because, as a matter of law, under the unambiguous terms of the contract," Columbia's invocation of section 3.1.3 precluded New Ulm from receiving a section 3.1.1 price for its gas. For the same reason, we overrule point of error two.

Columbia's third point of error asserts that the trial court erred in failing to grant its motion for judgment notwithstanding the jury's finding that Columbia committed fraud, "because, as a matter of law, under the unambiguous terms of the contract," Colum-

bia's invocation of section 3.1.3 precluded New Ulm from receiving a section 3.1.1 price for its gas. For the same reason, we overrule point of error three.

### Points of Error Four, Five, and Six

Columbia argues points of error four, five, and six together. Columbia contends in those points that the trial court erred in excluding evidence, contained in Columbia's five bills of exception, that reflects Columbia's intent that section 3.1.1 pricing could not be utilized once Columbia invoked section 3.1.3. The evidence to which Columbia refers is the pricing history between it and the five other sellers, besides New Ulm, with which Columbia had a gas sales contract during the period in controversy. The evidence demonstrates how Columbia and the five other sellers treated the issue of pricing, i.e., whether pricing was controlled by section 3.1.1 or section 3.1.3, after Columbia invoked section 3.1.3, as it did with New Ulm.

Because Columbia, in these points of error, seeks a reversal and remand on the basis of the exclusion of evidence, Columbia must show "(1) that the trial court did in fact commit error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment." *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989).

### 1. Did the trial court err in excluding the evidence?

The general rule in Texas is that a party's prior transactions with entities other than the one opposed by the party in the lawsuit are irrelevant and violate the rule that *res inter alios* acts are incompetent evidence. *Texas Cookie Co. v. Hendricks & Peralta, Inc.*, 747 S.W.2d 873, 881 (Tex.App.—Corpus Christi 1988, writ denied); *Texas Farm Bureau Mut. Ins. Co. v. Baker*, 596 S.W.2d 639, 642 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.). However, an exception to this rule states that:

[W]hen the *intent* with which an act is done is material, other similar acts of the party whose conduct is drawn in question may be shown, provided they are so connected with the transaction under consid-

eration in point of time that they may all be regarded as part of a system, scheme or plan.

*Texas Cookie Co.*, 747 S.W.2d at 881 (quoting *Baker*, 596 S.W.2d at 643, which quotes *Texas Osage Co–Operative Royalty Pool, Inc. v. Cruze*, 191 S.W.2d 47, 51 (Tex.Civ.App.—Austin 1945, no writ)); *see Underwriters Life Ins. Co. v. Cobb*, 746 S.W.2d 810, 815 (Tex. App.—Corpus Christi 1988, no writ); *Payne v. Hartford Fire Ins. Co.*, 409 S.W.2d 591, 594 (Tex.Civ.App.—Beaumont 1966, writ ref'd n.r.e.).

This exception was applied by a federal court in *Cibro Petroleum Prods., Inc. v. Sohio Alaska Petroleum Co.*, 602 F.Supp. 1520 (N.D.N.Y.1985), *aff'd*, 798 F.2d 1421 (Temp.Emer.Ct.App.1986) (the appellate court adopted the district court's "well-reasoned opinion as our own"). In *Cibro Petroleum*, the court interpreted an ambiguous crude oil supply contract. 602 F.Supp. at 1546. The interpretations urged by the parties were "diametrically-opposing." *Id.* The court turned to a review of Sohio's crude oil supply contracts with other companies not involved in the lawsuit for evidence of Sohio's intent in entering into the contract at issue. *Id.* at 1551. The court held that "[n]otwithstanding [ ] protestations to the contrary, these contracts are admissible to aid the court in interpreting the term clause at issue in this litigation." *Id.* The court agreed that "a party's business transactions with third parties is [sic] relevant to prove the meaning of a contract in appropriate cases" and stated that:

> [T]here are strong arguments in favor of the rejection of proof concerning third party contracts where similarities are weak and comparisons strained, but there is no excuse for absolute exclusion of evidence that outlines a clear course of dealing or habit of doing business.

*Id.* (quoting 2 J. Weinstein & M. Berger, *Weinstein's Evidence*, § 406[03] at 406–18 (1982)).

Other federal cases are in accord on the issue. *See, e.g., Federal Express Corp. v. Pan Am. World Airways, Inc.*, 623 F.2d 1297, 1301 (8th Cir.1980) (where ambiguous contract at issue was "virtually the same written agreement" as was used by party in other sales, the meaning ascribed to the contract terms in the other sales "had some relevance to this transaction, and the trial court clearly was correct in considering it").

Here, the excluded evidence consists of a series of "market out" pricing agreements between Columbia and the five producers, which were Amerada, Kaiser Francis, Amoco Production, Unocal, and Superior (succeeded by Mobil). As noted, of these five sales contracts, two were identical to Columbia's contract with New Ulm, and three differed only in the numbering of their sections. The evidence demonstrates that Columbia paid *section 3.1.3 prices* for the gas it bought from the five producers after Columbia invoked that section. It shows that Columbia (and, for that matter, each of the five producers) consistently interpreted the same pricing provisions that are at issue in this case to mean that it could pay section 3.1.3 prices once it had invoked that section of the agreement.[2]

The primary concern in construing an ambiguous contract is to "ascertain and give effect to" the intent of the parties. *Radx Corp.*, 658 S.W.2d at 301. Columbia's evidence of how it interpreted the two pricing provisions in its transactions with other sellers, i.e., which section's prices it believed itself bound to pay after it invoked section 3.1.3, is relevant and admissible on the key issue of Columbia's intent regarding what prices it would be bound to pay New Ulm after Columbia invoked section 3.1.3. It was

---

2. Each of the five producers adhered to Columbia's selection of section 3.1.3 prices after Columbia invoked that section. None of the producers attempted to impose the more lucrative (to them) prices under section 3.1.1. For example, the five pricing agreements between Amerada and Columbia were embodied in contracts like the one at issue here. Columbia issued five "market out" letters covering, among other units, the Blezinger Unit, the same one at issue here. Amerada, receiving section 3.1.3 prices from Columbia for its gas after Columbia "marketed out," collected $628,838.48; it would have collected $2,378,306.73 using section 3.1.1 pricing.

error for the trial court to exclude that evidence.

■ New Ulm argues that "[i]f Columbia's purpose in offering the evidence was to prove its interpretation of the contract, the evidence was cumulative and properly excluded." There are three reasons we disagree that the evidence was excludable on the ground that it was cumulative.

First, the premise of New Ulm's argument is faulty; the exception quoted above does not relate to *interpretation*. It relates to *intent*. There is a distinction between a party's interpretation of a contract and its *intent* in entering into the contract in the first place. The exception quoted above and relied on by Columbia concerns *intent*; in other words, it relates to Columbia's purpose, or aim, in entering into the contract with New Ulm.

Second, we note that the "cumulative" issue was not a factor in the cases quoted above that applied the exception. We cannot state that the specific objection of "cumulative" was made in any of those cases; however, the evidence was objected to on *some* grounds in some of those cases, most notably *Cibro Petroleum*. *See* 602 F.Supp. at 1551 ("*Notwithstanding defendant's protestations to the contrary*, these contracts are admissible to aid the court in interpreting the term clause at issue in this litigation.") (emphasis added). Further, it would seem that a cumulative objection could *always* be made in a case where one party seeks to introduce "other similar acts" to show its intent in entering "the transaction under consideration." The "other similar acts" would *always* be cumulative of any other evidence of that party's intent. Yet the cases quoted above specifically allow that evidence.

In fact, *Cibro Petroleum* states that, in order to discern a party's intent, the court can consider evidence of negotiations, trade usage and custom, documentary evidence, and "other indicia" of intent. 602 F.Supp. at 1547. Under New Ulm's argument, only *some* of that evidence could come in; the rest would be "cumulative." That is plainly not what *Cibro Petroleum* and the other similar cases intend. The clear intent of *Cibro Petroleum* and the others is to allow the evidence to come in. We do not believe a "cumulative" objection would have been persuasive under the facts in those cases, and we do not believe such an objection is persuasive here.

Third, the evidence to which New Ulm points in support of its "cumulative" argument does not support that argument. New Ulm states that "Columbia offered the testimony of at least four witnesses regarding its interpretation of the contract and one of the witnesses testified that Columbia exercised its market out rights under 'each and every one' of its contracts." As noted above, there is a difference in how Columbia interpreted its contracts and Columbia's intent in entering the contracts to begin with.

**2. Was the error reasonably calculated to cause and did it probably cause rendition of an improper judgment?**

■ The intent of the parties is the critical issue in construing an ambiguous contract. *Radx Corp.*, 658 S.W.2d at 301. When a trier of fact is faced with a contractual ambiguity, it looks to indicia of this intent to construe the contract. *Cibro Petroleum*, 602 F.Supp. at 1547.

■ Here, substantial evidence on the issue of Columbia's intent when it entered into the contract with New Ulm, i.e., on the most important issue in the case, was excluded. When evidence that is controlling on a critical issue dispositive of the case is wrongly excluded, the error is reversible. *See Gee*, 765 S.W.2d at 396. That is the case here.

Columbia has met its burden under *Gee*. We therefore sustain points of error four, five, and six.

**Points of Error Seven and Eight**

In points of error seven and eight, Columbia contends that the trial court erred in refusing to submit to the jury two instructions offered by Columbia on the issue of waiver. If we sustained either or both of these points, Columbia would at most be entitled to a remand, not a rendering of judgment in its favor. Since we have already reversed and remanded the cause based on points of error four, five, and six, for us to address these two points of error would be

"advisory." We do not know what evidence of waiver, if any, will appear in the retrial, and thus we cannot say that any error that may have occurred in the trial court's refusal to submit Columbia's requested instructions is likely to reoccur.

### Conclusion

We reverse the judgment of the trial court and remand the cause.