COLUMBIA GAS TRANSMISSION
CORPORATION, Petitioner,

v.

NEW ULM GAS, LTD., Respondent.

No. 94–1206.

Supreme Court of Texas.

Argued Feb. 13, 1996.

Decided Oct. 18, 1996.

Rehearing Denied Dec. 13, 1996.

Thomas H. Lee, J. Eric Toher, Houston, for petitioner.

Tom W. Reavley, Ray H. Langenberg, Steven Goode, Austin, Charley L. Smith, Beeville, for respondent.

ABBOTT Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, HECHT, CORNYN, ENOCH, SPECTOR, OWEN and BAKER, Justices, join.

This case primarily concerns the proper interpretation of pricing provisions in a gas contract.[1] The trial court held that the pricing provisions were ambiguous and awarded contract and fraud damages to New Ulm Gas, Ltd. in accordance with a jury verdict. The court of appeals reversed and remanded, determining that the trial court had correctly concluded that the contract was ambiguous, but that evidentiary errors made by the trial court necessitated a remand. 886 S.W.2d 294. We disagree with the appellate court's conclusion that this contract was ambiguous. We reverse the judgment of the court of appeals on the contract claims and render judgment in favor of Columbia Gas Transmission Corporation. We affirm that part of the judgment of the court of appeals remanding New Ulm's fraud claim to the trial court.

Fred Fox acquired oil and gas leases on about 7,000 acres of the New Ulm Field near New Ulm, Texas. He later assigned these leases to various oil companies, reserving an overriding royalty interest to himself. In 1985, Fox acquired a working interest in one part of the New Ulm Field from the Mobil Oil Company, and he formed a limited partnership, New Ulm Gas, Ltd. (New Ulm), to drill a well and produce natural gas from this interest.

The well was subject to a contract entered into in 1980 between Mobil's predecessor, The Superior Oil Company, and Columbia Gas Transmission Corporation. This contract committed Superior and its successors (including New Ulm) to sell gas from the well to Columbia. Sections 3.1.1 and 3.1.3 were the two primary pricing provisions in this contract.

Section 3.1.1 was the initial pricing mechanism and took effect from 1980 through at least December 31, 1984. The pricing mechanisms of section 3.1.3 could then be invoked by either party "[a]t any time after December 31, 1984 and from time to time thereafter." On January 1, 1985, Columbia invoked section 3.1.3. The parties thereafter entered into a series of price agreements pursuant to the provisions of 3.1.3.

In March 1988, New Ulm attempted to re-invoke the pricing mechanisms of 3.1.1. New Ulm contended that, even after Columbia had elected a section 3.1.3 renegotiation, New Ulm could unilaterally change that price by electing the section 3.1.1 price. According to New Ulm, if Columbia then made a good faith determination that the 3.1.1 price did not reflect current market prices, it could re-elect 3.1.3. This scheme would thus create a loop of pricing elections that could continue indefinitely.

Columbia refused to utilize the 3.1.1 prices invoked by New Ulm in March 1988. Columbia contended that it had the option to make the 3.1.3 election anytime after December 31, 1984. Once this election was made, Columbia argued, the only price changing mechanism was the one contained in 3.1.3. Columbia maintained that New Ulm could not unilaterally alter the section 3.1.3 negotiated price by simply electing another price under section 3.1.1. Instead, if the current price determined under 3.1.3 was unacceptable to New Ulm because it no longer reflected the current market price, then New

---

1. There are actually five substantially identical contracts at issue, but, for purposes of simplicity, we will refer to the contracts as a single contract.

Ulm had the option of renegotiating the price under 3.1.3.

New Ulm then sued Columbia, seeking contractual damages for the period from April 1988 through July 1991. New Ulm also sought damages for allegedly fraudulent statements made by Columbia in 1986 concerning the price of gas. Both parties moved for summary judgment, but the trial court denied their motions on the basis that the contract was ambiguous. Accordingly, a jury trial was held to determine the parties' intent. The jury found for New Ulm and awarded approximately $1.7 million in contract damages, another $2.3 million for damages from Columbia's fraud, and attorney's fees. The trial court rendered judgment on the jury's verdict and Columbia appealed.

The court of appeals agreed with the trial court that the contract was ambiguous and that a fact issue existed regarding the intent of the parties. However, the court of appeals reversed and remanded for a new trial on the basis that the trial court had committed harmful error by improperly excluding certain evidence concerning the parties' intent. Both parties then filed applications for writ of error with this Court.

We hold that the contract is not ambiguous and that section 3.1.1 was no longer a pricing option after Columbia invoked section 3.1.3. Accordingly, New Ulm is not entitled to the contractual damages awarded by the jury. We also conclude that New Ulm's fraud claim must be remanded to the trial court.

I

■■■ Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *National Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *CBI*, 907 S.W.2d at 520; *Coker*, 650 S.W.2d at 393; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent. *Daniel*, 243 S.W.2d at 157; *see also generally CBI*, 907 S.W.2d at 520.

■■■ An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727 (Tex.1981). For an ambiguity to exist, both interpretations must be *reasonable. See CBI*, 907 S.W.2d at 520; *see also Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex.1977). In this case, we must decide whether there is more than one reasonable interpretation of this contract such that a fact issue was created concerning the parties' intent.

We begin with an examination of the contract language. Section 3 of the contract is entitled "PRICE" and provides, in pertinent part:

The price to be paid by Buyer [Columbia] to Seller [New Ulm] for all gas delivered hereunder, or made available and not taken as herein provided, shall be as follows:

3.1.1 For gas produced, sold and delivered hereunder, or any portion thereof, which the United States Congress, the Federal Energy Regulatory Commission, or any governmental authority having jurisdiction in the premises, ceases or has already ceased to have jurisdiction or exercise control over rates that may be lawfully charged and collected (hereinafter referred to as "deregulated gas"):

(i) Subject to Section 3.1.1(ii) hereof, the initial price shall be Five Dollars and Thirty–Five Cents ($5.35) per MMBtu effective June 1, 1980, and shall be adjusted on the first day of each month thereafter in the manner provided below. . . .

(ii) Seller may request a determination of an alternate price to be paid by Buyer hereunder to be effective on the first day of each calendar quarter and shall remain in effect thereafter until Seller requests a different alternate price. Such request for determination of an alternate price shall be made to Buyer in

writing within fifteen (15) days prior to the beginning of the calendar quarter for which such alternate price will be effective and shall designate Seller's election of the alternate price; provided, however, Seller may request a determination of an alternate price within fifteen (15) days following execution of this contract, said alternate price to be effective from execution hereof until Seller requests a different alternate price. The alternate price shall be selected by Seller from the following alternatives:

. . . .

3.1.3 At any time after December 31, 1984 and from time to time thereafter, either Buyer or Seller may request the renegotiation of price to be paid for the gas sold and delivered hereunder, in which case the party making such request must demonstrate in good faith that the price being paid does not reflect the market value of the gas being sold in the area where it is produced or the market value of the gas in the area where it is being consumed. In such case the parties shall review the circumstances and supporting data in a good faith effort to rectify the situation by mutually agreeing to a new price or Seller may seek a third party purchaser for the gas. In the event that a bona fide offer is received by Seller from a third party purchaser, Buyer shall have the option either to match such offer and continue to purchase the gas hereunder or to release the gas at issue. If no bona fide third party purchaser offer is received, then the parties hereto shall try for thirty (30) days to negotiate an acceptable price. If the parties fail to agree on a price, the matter will be referred to arbitration as provided in Section 17 hereunder. During the period of any negotiations or arbitration the gas will continue to be sold and purchased at the price in effect at the time of the notice.

The parties disagree on the effect of this language. Columbia argues that the invocation of 3.1.3 trumps 3.1.1, while New Ulm contends that 3.1.3 and 3.1.1 operate in tandem in a potentially continuous cycle. We believe that New Ulm's interpretation is un-reasonable, and that Columbia's interpretation is correct as a matter of law.

Determining a price under section 3.1.1 is a relatively simple process in which the price is first computed from an initial price and an index. The seller then has the right to request an alternate price from four pricing options within fifteen days of any calendar quarter. This alternate price would then remain in effect until the seller requested a different alternate price.

In contrast, establishing a price under section 3.1.3 is a potentially lengthy and arduous process. First, either the buyer or the seller has the right to utilize 3.1.3, but only after a good faith demonstration that the price being paid does not reflect the market value of the gas. The 3.1.3 process then requires that the parties attempt to mutually agree to a new price. If this effort fails, the seller can seek a third party purchaser for the gas. If the seller receives an offer from a third party, the buyer has the option to match; if no offer is received, the parties must negotiate for thirty days before the matter is submitted to arbitration. The pricing determination can then remain in arbitration for two or more months under the arbitration procedures provided in section 17 of the contract.

Under New Ulm's interpretation, even after Columbia invoked section 3.1.3, New Ulm had the absolute right to select a 3.1.1 price within fifteen days of the end of any calendar quarter. Columbia would then have to object to this price and go through the procedures of 3.1.3 to select a new price. As soon as the 3.1.3 price was determined, New Ulm contends it could select a 3.1.1 price again, causing the 3.1.3 process to begin anew in a continuous cycle.

Under this interpretation, it is possible that a 3.1.3 price could never be established. Even New Ulm's expert admitted that it would not be unusual for the 3.1.3 procedures to take more than a calendar quarter to complete. New Ulm could then make another election under section 3.1.1 in a subsequent calendar quarter while the parties were in the process of determining a 3.1.3 price from a prior calendar quarter. Such an election could potentially start the 3.1.3 process again from scratch. Accordingly, New

Ulm's interpretation has the dual effect of wreaking pricing havoc and eliminating the viability of section 3.1.3.

■ We do not believe that New Ulm's circuitous interpretation of this contract is reasonable. In determining the parties' agreement, we are to examine all parts of the contract and the circumstances surrounding the formulation of the contract. *CBI,* 907 S.W.2d at 520; *Forbau,* 876 S.W.2d at 133; *Coker,* 650 S.W.2d at 393–94. When this contract was signed in 1980, it is undisputed that the parties knew that a huge volume of gas would be deregulated on January 1, 1985. The effect this deregulation would have on the price of gas was not known, however. It is therefore not surprising that the parties incorporated a market-out provision (section 3.1.3) that established a complex procedure to adjust the section 3.1.1 price to the market price of gas. The interpretation of 3.1.3 proffered by New Ulm would frustrate the intent of this provision.

New Ulm's interpretation would require us to assume that the parties intended constant, costly, and needless price renegotiations. New Ulm would also have us rule that it had the right to constantly invoke 3.1.1 in the hope that Columbia would fail to respond with its own 3.1.3 election such that the price would be set at a higher level. It is inconceivable that the parties intended such a perverse result in this contract.

Moreover, New Ulm's interpretation ignores the contract language. Section 3.1.1(ii) states that the alternate price to be paid by the buyer "shall remain in effect thereafter until Seller requests a different alternate price." In contrast, section 3.1.3 provides that "[a]t any time after December 31, 1984 and from time to time thereafter, *either Buyer or Seller* may request the renegotiation of price...." (emphasis added). The only way these otherwise conflicting provisions can be harmonized is by concluding that 3.1.3 is the controlling price mechanism once it is invoked.

Furthermore, New Ulm's interpretation depends upon an assumption that 3.1.3 could be invoked by Columbia in response to New Ulm's request for an alternate price determination under 3.1.1. This assumption conflicts with the text of the contract. Section 3.1.3 provides that it is only available if the price *being paid* does not reflect the market value of the gas. Section 3.1.3 simply has nothing indicating that it could be used in response to a request for an alternate price to be paid in the future. Thus, it would appear that Columbia would have to let the higher 3.1.1 price go into effect and then challenge it, creating a "yo-yo" pricing effect *every* quarter.

The only reasonable interpretation of this contract is Columbia's interpretation that 3.1.1 is the controlling price mechanism unless and until a 3.1.3 price is properly elected. This interpretation quite reasonably provides a mechanism available to either Columbia or New Ulm to renegotiate under 3.1.3 when the price being paid for gas does not reflect the true market value of the gas. It does not, as New Ulm's interpretation does, permit any party, at any time, to impose an artificially constructed non-market price for the gas after deregulation occurred on January 1, 1985. There is no potential for a continuous cycle of pricing re-determinations (unless the market itself fluctuates excessively), and all of the contract provisions are properly harmonized and afforded weight. Moreover, this interpretation properly considers the circumstances surrounding the formulation of the contract and gives effect to the parties' uncertainty regarding the effect of deregulation on gas prices.

■ New Ulm urges that there are two major problems with Columbia's interpretation of the contract. First, New Ulm maintains that there is no express language in the contract clearly providing that the invocation of 3.1.3 trumps 3.1.1. While it is true that there is no express language to this effect, we believe the only reasonable interpretation of this contract is that 3.1.3 controls once it is selected. The failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists.[2] *See Daniel,* 243

2. New Ulm also asserts that the testimony of a Columbia executive establishes that the contract

was not more explicit because gas producers would not agree to such an express provision.

S.W.2d at 158–59 (even though meaning of key phrase in contract was not clear, contract was not ambiguous when only one reasonable interpretation of the contract existed).

New Ulm also maintains that Columbia's interpretation is not reasonable because it ignores provisions in section 3.1.2 of the contract. Section 3.1.2 provides a ceiling on the price per MMBtu that the buyer can be required to pay under section 3.1.1. There is a different ceiling provided for gas sold on or before December 31, 1984 than for gas sold after that date. It is New Ulm's argument that Columbia's interpretation renders the provision providing for a different ceiling after December 31, 1984 meaningless. We disagree. Columbia's interpretation does not mean that section 3.1.3 immediately controls after December 31, 1984; rather, it means that 3.1.3 controls *if and when it is invoked* at any time after that date. Accordingly, the 3.1.1 price could have stayed in effect after December 31, 1984 if neither the buyer nor the seller made a 3.1.3 election. Because pricing under 3.1.3 is a complex process, the parties could have chosen not to elect 3.1.3 at all or could have waited until well after January 1, 1985 to make such an election. Thus, the 3.1.2 ceiling could have been employed after December 31, 1984.

■ We conclude that the contract is not ambiguous and that the parties' intent should not have been submitted to the jury.[3] Accordingly, we render judgment for Columbia on New Ulm's contract claim.[4]

## II

Columbia also contends that it is entitled to a judgment that New Ulm is not entitled to recover for fraud, rather than a remand of this issue for a new trial. New Ulm contends that it is entitled to rendition of judgment on the jury's fraud findings. We disagree with both contentions.

New Ulm asserted two fraud theories. One was that Columbia represented in 1986 that section 3.1.1 had been removed from the contract pursuant to a sealed settlement agreement between Columbia and Superior. New Ulm claims that this misrepresentation caused it to agree to prices from 1986 until 1988 that were significantly lower than the prices it was entitled to under section 3.1.1. New Ulm's second fraud claim was that Columbia misrepresented that it would pay the same price to New Ulm that it was paying to Mobil Oil Company for gas from the New Ulm Field, which also led New Ulm to agree to lower gas prices than it would have received. Both theories were submitted to the jury in one question which asked simply whether Columbia defrauded New Ulm. The jury answered "yes" to this question.

■ Columbia correctly asserts that New Ulm is not entitled to recover on its first fraud theory. Because the contract unambiguously provided Columbia the absolute right to invoke section 3.1.3 after December 31, 1984, the determination that Columbia fraudulently precluded New Ulm from making a 3.1.1 election (which New Ulm no longer had any legal right to make) was without legal effect and immaterial. *See Brown v. Armstrong*, 713 S.W.2d 725, 727–29 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *see also* Rhodes, *Broad Form Submissions and* Spencer v. Eagle Star Insurance Company: *The Death of the Immaterial Issue*, 46 BAYLOR L. REV. 841, 851–53, 866 (1994). After Columbia invoked 3.1.3 on January 1, 1985, New Ulm could no longer make an election under 3.1.1 under the plain and unambiguous language of the contract. Accordingly, any statement by Columbia in 1986 that 3.1.1 had been removed was of no consequence.

However, Columbia has not challenged New Ulm's second fraud theory by any point

---

Such testimony does not, however, render Columbia's interpretation unreasonable. Moreover, it is improper to utilize such testimony to establish an ambiguity when the contract is otherwise unambiguous. *See CBI*, 907 S.W.2d at 520–22.

**3.** It is therefore not necessary for us to address New Ulm's contention that the court of appeals

erred by remanding this cause for a new trial as a result of evidentiary errors.

**4.** We do not disturb, however, the stipulation of the parties that New Ulm is entitled to $15,-758.60 for gas delivered by New Ulm but not paid for by Columbia before Columbia initiated bankruptcy proceedings.

of error in this Court. Consequently, we cannot hold that the court of appeals should have rendered judgment in Columbia's favor rather than remanding New Ulm's second fraud claim for retrial.

New Ulm's contention that it is entitled to rendition of judgment against Columbia for fraud is based solely on its argument that the court of appeals erred in holding that the trial court erroneously excluded evidence pertaining to the construction of the contract. Our holding that the contract was unambiguous makes this argument irrelevant. New Ulm asserts no other basis for rendition of judgment for fraud. Consequently, we cannot hold that the court of appeals erred in remanding New Ulm's second fraud claim for retrial rather than rendering judgment for New Ulm.

The court of appeals' remand of New Ulm's fraud claim must therefore be affirmed.

### III

In conclusion, because this contract is not ambiguous, we reverse in part the judgment of the court of appeals and render judgment that New Ulm take nothing other than the stipulated damages on its contract claims. We also affirm the appellate court's judgment in part by remanding New Ulm's fraud claim to the trial court for further proceedings consistent with this opinion.

GONZALEZ, Justice, dissenting.

The dispute in this case turns on whether the pricing provisions in a gas purchase contract are ambiguous. Both Columbia Gas and New Ulm Gas moved for summary judgment, each asserting that its interpretation of the contract is correct and that the other's is unreasonable. The trial court concluded that the contract is ambiguous and submitted the question of its proper construction to the jury. Considering conflicting evidence, the jury agreed with New Ulm's interpretation and awarded $5,690,755 in damages to New Ulm. A unanimous panel of the court of appeals agreed that the contract is ambiguous and held that the trial court properly submitted the issue to the jury. 886 S.W.2d 294. Nonetheless, a majority of this Court

today reverses and renders for Columbia on this issue. 940 S.W.2d 587. I disagree.

A contract is ambiguous when its meaning is uncertain or it is reasonably susceptible to more than one interpretation. *See Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983)); *Criswell v. European Crossroads Shopping Ctr.*, 792 S.W.2d 945, 950–51 (Tex.1990) (Gonzalez, J., concurring and dissenting). In the case before us, it is unclear whether section 3.1.1 can be used to determine pricing after section 3.1.3 is invoked, and the language in question is reasonably susceptible to more than one meaning. Thus, for the reasons stated in the court of appeals' opinion, I would affirm the judgment of the court of appeals.