**Adriana CANO, M.D., Appellant,**

v.

**NORTH TEXAS NEPHROLOGY ASSOCIATES, P.A., Appellee.**

**No. 2–01–276–CV.**

Court of Appeals of Texas, Fort Worth.

Feb. 13, 2003.

Jackson Walker, L.L.P., James M. McCown, Dallas, for Appellant.

Cantey & Hanger, L.L.P., Evelyn R. Leopold, Fort Worth, Baker Sterchi Cowden & Rice, Hal D. Meltzer, Kansas City, MO, for Appellee.

Panel B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### I. INTRODUCTION

Appellant Adriana Cano, M.D. brought suit against her former employer, appellee North Texas Nephrology Associates ("NTNA"), for breach of contract, fraudulent inducement, and for a declaratory judgment. Appellant moved for a partial summary judgment on the liability portion of her breach of contract claim, which the trial court denied. The case was tried before a jury, and at the close of appellant's case-in-chief, NTNA moved for a directed verdict on appellant's fraudulent inducement claim, which was granted by the trial court. The jury returned a verdict in favor of NTNA on the breach of contract claim, and the trial court rendered a judgment that appellant take nothing on her claims and awarded attorney's fees to NTNA. In five issues, appellant complains that: (1) the trial court erred in denying her motion for summary judgment; (2) the trial court erred in granting NTNA's directed verdict on her fraudulent

inducement claim; (3) the trial court erred when it excluded from evidence the contract of a subsequent employee of NTNA; (4) the jury's verdict was not supported by legally or factually sufficient evidence; and (5) the trial court erred when it awarded attorney's fees to NTNA. We affirm the trial court's judgment.

## II. BACKGROUND

Appellant was raised in Mexico but attended college in the United States. After college, appellant attended medical school at the University of Texas Southwestern Medical School. She completed a residency in nephrology, a medical specialty concerning the kidneys, and remained at the medical school for an additional four years for a nephrology fellowship. After her fellowship, she stayed at the school for another four years as an assistant professor.

In late 1996, appellant sought employment as a private practitioner. NTNA contacted her and negotiated with her concerning potential employment through its sole shareholder, Dr. Victor Meltzer ("Dr.Meltzer"). Appellant testified that Dr. Meltzer told her she would be eligible to be a "partner" after her first two years of employment and that a second doctor at NTNA was a partner.

Appellant eventually accepted a position with NTNA. NTNA drafted an employment agreement that provided she would receive an annual base salary of $150,000 and possible discretionary bonuses from time to time. The agreement also stated that, appellant would be eligible for "productivity compensation" every six months. Paragraph 3.02 of the employment agreement sets forth a formula for determining the amount of her productivity compensation using the "adjusted net profit" appellant generated. The agreement defined "adjusted net profit" as "the amount received in cash by [NTNA] during the relevant time period *for services rendered* by [appellant]." [Emphasis added.] Both parties signed this agreement in February 1997.

Appellant began working for NTNA on July 14, 1997. Along with performing billable services at hospitals and at the offices of NTNA, Cano also performed services at an outpatient clinic for chronic dialysis patients. These patients would come to the clinic three times per week on either Monday, Wednesday, and Friday or Tuesday, Thursday, and Saturday, at various times during the day. NTNA received a capitation fee from Medicare, Medicaid, and various insurers for the outpatient dialysis services performed at the clinic. The capitation fee was a fixed, flat amount paid for each patient for every day that the patient was not in the hospital, regardless of whether the patient went to the clinic or not. This fee covered the kidney dialysis procedure and a number of other services that could be rendered during dialysis.

Appellant later learned that NTNA, as a matter of policy, did not include the capitation fees paid for non-billable dialysis services when calculating the amount of productivity compensation *unless* the physician providing the service was the actual physician of record for the dialysis patient. In other words, even though Cano might be the attending NTNA physician at the dialysis clinic, if she was not the actual physician of record for a patient, that patient's capitation fee would not be included in Cano's productivity compensation calculation. After several attempts to acquire more information and to discuss the misunderstanding, appellant tendered her notice of resignation on May 1, 1998, effective June 30, 1998.

## III. DISCUSSION

### Breach of Contract

In her first issue, appellant complains that the trial court erred when it

denied her motion for summary judgment on the liability portion of her breach of contract claim. An order overruling or denying a motion for summary judgment is not a proper subject for appeal. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996). We overrule appellant's first issue.

In her fourth issue, appellant complains that the jury's verdict finding that the parties had *not* agreed the bonuses would include fees generated at the outpatient dialysis clinic is not supported by legally or factually sufficient evidence. The trial court submitted the following question to the jury:

> Did [appellant] and [NTNA] agree that [appellant] would be paid productivity compensation by [NTNA] based upon the cash received by [NTNA] for all of services rendered by [appellant], including fixed flat fee payments (capitations payments) for outpatient dialysis patients where cash received for such patients is attributable to patients for which [appellant] was not the physician of record but for which services were rendered by [appellant]?

The jury answered "No" to this question.

 When the party with the burden of proof challenges the legal sufficiency of the evidence to support an unfavorably answered jury question, it is a claim that the contrary proposition was established as a "matter of law." *Gooch v. Am. Sling Co.,* 902 S.W.2d 181, 183–84 (Tex.App.-Fort Worth 1995, no writ). To prevail on this issue, Cano must overcome two hurdles. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition

is established as a matter of law. *Id.; Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

 When a party with the burden of proof asserts that the evidence is factually insufficient to support an adverse answer to a jury question, it is an assertion that the answer was "against the great weight and preponderance" of the evidence. *Gooch,* 902 S.W.2d at 184. In reviewing an issue asserting that an answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the issue should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Appellant contends that the employment contract was clear and unambiguous and may be interpreted as a matter of law. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983) (stating interpretation of a written contract is a matter of law if the contract is clear and unambiguous). Appellant's briefing attempts to focus on the question of whether the work appellant performed at the dialysis clinic was for "services rendered" within the meaning of her employment agreement. This position ignores the central issue in this case: whether any capitation fees paid to NTNA for the relevant time period can be charac-

terized as "cash received" for any "service rendered" by appellant.

When a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law. *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999); *Coker,* 650 S.W.2d at 393. A contract is not ambiguous merely because parties to an agreement have different interpretations of a term or phrase. *DeWitt,* 1 S.W.3d at 100; *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994) (op. on reh'g). A contract is ambiguous only if, after the application of established rules of construction, an agreement is still susceptible to more than one reasonable meaning. *DeWitt,* 1 S.W.3d at 100; *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996).

If the meaning of language used in a written agreement becomes uncertain when applied to the subject matter of the contract, the contract is latently ambiguous. *Birmingham Fire Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 947 S.W.2d 592, 603 (Tex.App.-Texarkana 1997, writ denied); *see Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995) (op. on reh'g). Although the determination of whether a contract is ambiguous should be limited to an examination of the language of the agreement, courts may examine extrinsic evidence of "surrounding circumstances" or "the subject matter of the contract" to determine if a latent ambiguity exists. *Birmingham,* 947 S.W.2d at 603.

There is no ambiguity on the face of the contract at issue in this case. Attempting to fit the capitation fees paid to NTNA for outpatient dialysis services to the definition of "adjusted net profit," however, creates a latent ambiguity in the contract.

On the one hand, it is certainly a reasonable interpretation to say that the capitation fees are undoubtedly "cash received" and that the work appellant performed while she attended to the dialysis patients at the clinic was for "services rendered." On the other hand, it is also reasonable to interpret the contract to exclude the capitation fees from the term "cash received for services rendered" because it is difficult to attribute the fee to any particular service performed. As we have noted above, the capitation fees are fixed amounts paid to NTNA for each patient for every day the patient is *not* in a hospital. Because the patients only receive treatment three times per week, the capitation fee is even paid for days for which *no service is performed at all.* Further, being a fixed amount, the fee does not vary even if extensive procedures other than mere dialysis are performed. Because it is difficult to attribute the fees to any particular service, it would be reasonable to conclude that the capitation fees are not "cash received" for any specific "service rendered." It is also reasonable to conclude that Cano was compensated for the services she provided at the clinic in her base salary.

Because both of these interpretations are reasonable, we conclude that the contract in this case is ambiguous. As a result, it was proper for the jury to resolve the fact issue of the parties' intent regarding the interpretation of this contract. *See, e.g., Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 529 (Tex.1987). Now we consider whether the jury's answer is supported by sufficient evidence.

We believe there is ample evidence in the record supporting the jury's rejection of appellant's proposed interpretation of the contract. First, the jury heard substantial testimony concerning the

nature of the capitation fees and could have reasoned that capitation fees cannot be attributed to any particular service rendered.

The fee is paid regardless of whether the patient arrives and is a fixed fee regardless of most extra services rendered there. Second, there was evidence in the record that appellant was aware of the nature of capitation fees before she entered into the contract with NTNA. The jury could have inferred that because appellant was aware of the nature of capitation fees, she would have also been aware of the fact that it would have been difficult to identify which portions of the fees paid to NTNA would be specifically attributable to her. There was conflicting evidence of whether Dr. Meltzer had represented to her that the capitation fees attributable to the clinic would be included in her productivity compensation calculation. The jury was also told the agreement was drafted by NTNA but that appellant had been represented during negotiations on the contract and had even successfully negotiated some modifications to it. Finally, the jury heard evidence that it had always been NTNA's policy not to include capitation fees in the formula for calculating the amount of productivity compensation. We conclude that the evidence was both legally and factually sufficient to support the jury's verdict. Accordingly, we overrule appellant's fourth issue.

### Admissibility of Subsequent Employment Contract

In her third issue, appellant contends the trial court erred when it excluded from evidence an employment contract between NTNA and another nephrologist, Dr. Porres, which was entered into after appellant

had resigned.[1] The trial court struck the Porres contract in its order denying appellant's motion for summary judgment. Appellant then re-offered the Porres contract at trial and the court excluded it again on NTNA's relevancy objection. The contract between appellant and NTNA was identical to the Porres contract in all but one aspect. Paragraph 3.02 of the Porres contract defined "adjusted net profit" as "cash [received] ... for services rendered by *and billed in the name of Physician.*" [Emphasis added.] Appellant contends the addition of the phrase "and billed in the name of" to paragraph 3.02 of the Porres contract was relevant to the issue of NTNA's intent regarding her contract. Appellant specifically argues that both the Porres contract and her contract cannot be interpreted in the same manner because they each contain different language in the productivity compensation clause. Appellant contends that the Porres contract is relevant to rebut NTNA's interpretation of her contract. NTNA responds claiming that the additional language in the Porres contract is a clarification and that both contracts may be construed in the same manner.

A trial court's ruling in admitting or excluding evidence is reviewable under an abuse of discretion standard. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527–28 (Tex.2000). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998). We will not reverse a judgment due to an erroneous evidentiary ruling unless the error probably caused rendition of an improper judgment. TEX.R.APP. P. 44.1, *Beam v. A.H.*

---

1. We do not address appellant's challenge to the trial court's ruling on the inadmissibility of the Porres contract at the summary judgment hearing for the same reasons set forth in our conclusion regarding appellant's first issue.

*Chaney, Inc.,* 56 S.W.3d 920, 924 (Tex. App.-Fort Worth 2001 pet. denied).

In Texas, the general rule is that a party's prior transactions with other parties are irrelevant and violate the rule that *res inter alios*[2] are incompetent evidence. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 886 S.W.2d 294, 299 (Tex.App.-Houston [1st Dist.] 1994), *rev'd on other grounds,* 940 S.W.2d 587 (Tex.1996). Only when the intent with which an act is done is material may other similar acts of that party be admissible, "provided they are so connected with the transaction under consideration in point of time that they may all be regarded as part of a system, scheme or plan." *Id.* at 299–300; *see also* TEX.R. EVID. 401, 402, 403, 404, 406; *Oakwood Mobile Homes, Inc. v. Cabler,* 73 S.W.3d 363, 375 (Tex.App.-El Paso 2002, pet. denied) (discussing doctrine of *res inter alios* and rules of evidence on habit).

Here the Porres contract was signed about four months *after* appellant resigned. It was not signed contemporaneously with or close in time to the Cano contract sufficient to make it part of a system, scheme, or plan. Likewise, it was signed *after* appellant had asserted claims against NTNA on her contract regarding this very clause. Appellant offered no evidence showing employment contracts and compensation formulas for Dr. Meltzer and Dr. Jameson.

At most the Porres contract might have shown that NTNA acknowledged its previous contract was ambiguous. Because we have concluded, however, that the contract was ambiguous, we cannot say that the Porres contract was relevant to any issue. Thus, we hold the trial court did not abuse its discretion in excluding the Porres contract, and overrule appellant's third issue.

### Directed Verdict on Fraudulent Inducement Claim

In appellant's second issue, she claims the trial court erred in granting NTNA's motion for directed verdict on her fraudulent inducement claim. At the conclusion of appellant's case in chief, NTNA moved for a directed verdict on all of appellant's causes of action. NTNA contended their was no evidence of the "intent" element to support her fraudulent inducement claim. Appellant contends the directed verdict was improper because there were fact issues surrounding her fraudulent inducement claim. A directed verdict is proper only under limited circumstances: (1) the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) the evidence is insufficient to raise a fact issue that must be established before the opponent is entitled to judgment. *Prudential Ins. Co. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000); *Boswell v. Farm & Home Sav. Ass'n,* 894 S.W.2d 761, 768 (Tex.App.-Fort Worth 1994, writ denied); *see also* TEX. R. CIV. P. 268.

In reviewing a directed verdict, we must view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex. 1983). Further, we must determine if there is any conflicting evidence of probative value that raises a material fact issue.

---

**2.** "Res inter alios" acts are those acts done between others or third parties. BLACK'S LAW DICTIONARY 1311 (7th ed.1999).

*White,* 651 S.W.2d at 262. If there is any such evidence on any theory of recovery, a determination of that issue is for the jury. *Szczepanik,* 883 S.W.2d at 649.

■ We must affirm a directed verdict, even though the trial court's rationale was erroneous, if the directed verdict can be supported on another basis. *Hycarbex, Inc. v. Anglo–Suisse, Inc.,* 927 S.W.2d 103, 108 (Tex.App.-Houston [14th Dist.] 1996, no writ).

■ To establish fraudulent inducement, a plaintiff must show a "material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998).

Appellant identifies several bases for her fraudulent inducement claim, including misrepresentations made as to the calculation of and ability to receive a productivity bonus, the opportunity for obtaining shareholder or partner status, the ability to obtain reimbursement of insurance expenses, the ability to participate in NTNA's 401(k), and statements regarding the vacation policy.[3] She also states that the sole basis for NTNA's directed verdict was lack of evidence of intent to deceive or defraud.

As to the interpretation of the productivity clause, appellant admitted in her testimony that there were no specific discussions regarding which income items were included in the formula. She complains more of Meltzer's failure to tell her that the services rendered at the clinic would not be included than that he represented to her they would be included.

In regard to her partnership status, she points primarily to the fact that Dr. Jameson, the other NTNA employee, was not a partner as represented by Dr. Meltzer. Both Dr. Meltzer and Dr. Jameson testified that they told appellant that partnership or the ability to share in profits could come after two years of employment. It is unclear whether Dr. Meltzer denied telling her Dr. Jameson was a partner, but Dr. Meltzer testified that appellant knew NTNA was a professional association and that there could be partnership tracks or shareholder tracks. He agrees they both discussed this issue in some of their many conversations and that it would be considered after she had been with NTNA for two years. Appellant acknowledges ownership would have to be something they both agreed upon in the future.

In regard to her reimbursement of insurance expenses, the testimony showed that while she had not been timely reimbursed in accordance with their employment agreement, appellant eventually was reimbursed. As to her ability to participate in NTNA's 401(k), the employment agreement provided that she could participate in accordance with the terms and provisions of the plan. Apparently, the plan did not allow employees to participate until they had been employed for at least one year. Again, appellant complains that no one told her she could not participate until she had been there that long. She testified she was told she could participate but that no one advised her of the eligibility requirements thus; she assumed she could participate right away.

Additionally, appellant contends she was denied vacation time she requested, which was allowed by the contract. The contract provides that the employee would be enti-

---

3. We note that appellant only pled fraudulent inducement on the alleged misrepresentation regarding the productivity compensation clause.

tled to fifteen weekdays of paid vacation per year. The contract specifically states, however, that NTNA would not be required to pay for or allow vacation in the event of termination by either party. The latter provision was handwritten into the contract and initialed by both parties. Further, paragraph 5.03 of the contract, regarding termination, has the following added language: "Vacation days are not available upon notice of termination, by either party." Appellant took one week of vacation in April and upon her return, she asked to take another week. She testified that Dr. Meltzer refused, but she also acknowledged that timing and scheduling of vacation was a management function.

While all of these complaints created obvious tension at NTNA, none of the evidence shows that any material misrepresentation was ever made to appellant. The contract that she admittedly signed covered each and every area of concern regarding her employment, except partnership or shareholder terms, which were the subject of only verbal discussions according to all the witnesses. To the extent appellant complains about a misrepresentation of Dr. Jameson's true status, we conclude that the evidence regarding the designation does not constitute a material misrepresentation or an indication of intent to deceive. Further, appellant had not yet been an employee long enough for the alleged partnership or shareholder verbal terms to begin. Therefore, we hold appellant did not raise a material fact issue regarding any of her theories. Appellant's second issue is overruled.

### Attorney's Fees

In her fifth issue, appellant contends the trial court erred when it awarded attorney's fees to NTNA. Specifically, she contends that because NTNA breached the agreement in ways separate from the failure to pay a productivity bonus, it is not entitled to an award of attorney's fees. Having concluded that the jury probably resolved the breach of contract claim against appellant, the jury appropriately awarded attorney's fees to NTNA under the terms of the contract. Appellant's fifth issue is overruled.

### IV. CONCLUSION

Having overruled each of appellant's issues, we affirm the trial court's judgment.