Motion for Rehearing Overruled; Affirmed in Part, Reversed and Remanded
in Part; Memorandum Opinion of June 29, 2004, Withdrawn and Substitute
Memorandum Opinion filed August 12, 2004













 

Motion for Rehearing Overruled; Affirmed in Part,
Reversed and Remanded in Part; Memorandum Opinion of June 29, 2004, Withdrawn and
Substitute Memorandum Opinion filed August 12, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00627-CV

____________

 

COASTAL TERMINAL
OPERATORS AND JAMES W. MCPHERSON, Appellants

 

V.

 

ESSEX CRANE RENTAL
CORP.,
Appellee

 



 

On Appeal from the 157th
District Court

Harris County,
Texas

Trial Court Cause No. 00-54077

 



 

S U B S T I T U T E   M E M O R A N D U M   O P I N I O N

We overrule appellee Essex Crane Rental
Corp.=s motion for
rehearing.  We withdraw the opinion issued
in this case on June 29, 2004, and we issue this opinion in its place. 








This is a breach-of-contract case in which
an equipment lessor was awarded summary judgment against the equipment lessee
and its president, whom the equipment lessor claimed was liable under a
personal guarantee.  We find that the
trial court correctly determined the unambiguous meaning of the president=s unusual
guarantee agreement and that appellants= challenges to the
summary judgment lack merit, except that there is a genuine issue of material
fact as to the reasonable attorney=s fees to be
awarded to the equipment lessor. 
Accordingly, we reverse, sever, and remand this attorney=s fees issue to
the trial court, and in all other respects we affirm the trial court=s judgment.  

                        I. 
Factual and Procedural Background

By means of a lease dated July 3, 1997, and a lease dated
September 18, 1998, appellant Coastal Terminal Operators leased two cranes from appellee Essex Crane Rental
Corp.  After Coastal breached these leases by failing
to make timely payments, Vincent Morano, the President of Essex at the time,
called appellant
James W. McPherson, the President of Coastal, to discuss Coastal=s failure to pay
under the leases.  Following these
conversations, McPherson sent
a letter dated January 12, 2000,  to
Morano as a representative of Essex.  This letter reads in its entirety as follows:

Please accept this letter as my personal guarantee to
pay the outstanding balance owing to Essex Crane by Coastal Terminal Operators,
Inc. in full out of the proceeds of the sale of Cargo Terminal Venture /
Jacintoport to Seaboard Corporation as soon as funds are released at the time
of closing.  We will inform you as soon
as this takes place.  As you know, this
is subject to Port
 of Houston Authority
approval and favorable filing of HRS with antitrust officials.  We do not foresee any problems as of this
date.

Thank you for your continuing patience as we endeavor
to resolve our financial problems.

 

The letter was signed by AJames W. McPherson,@ and it was written on Coastal
letterhead.








Port Venture f/k/a Cargo Terminal Venture (referred to herein
as Athe Venture@) is a venture that is owned 60% by
HDI, Ltd. and 40% by McPherson Interests, Ltd. 
There is no evidence in the record that James McPherson owns or controls
HDI, Ltd. McPherson Interests, Ltd. is a Texas
limited liability company owned by members of McPherson=s family.  McPherson is the President of McPherson
Interests and owns a 1% interest in that company.  McPherson testified at one of his depositions
that, after January 12, 2000, McPherson Interests had to sell its 40% interest
in the Venture as a result of McPherson having been indicted.  McPherson stated that the debt owed to McPherson
Interests was not paid by the buyer of the interest and that McPherson
Interests eventually foreclosed a security interest that it had in the 40%
interest in the Venture, regaining this interest.

Stephen Jacobs, an attorney for the
Venture in the Seaboard transaction, produced a letter agreement between HDI,
McPherson Interests, and others dated June 14, 2000.  This agreement is contained in the
summary-judgment evidence and states as follows:

(1)     Before May 30, 2000, the Venture sold and
conveyed substantially all of its assets to Seaboard Corporation or its
affiliate under an Asset Purchase Agreement dated May 12, 2000.

(2)     McPherson Interests acknowledges that it
has received an executed counterpart of the Asset Purchase Agreement and that it
approves the transaction described therein for all purposes.

(3)     On May 30, 2000, McPherson Interests duly
conducted a foreclosure sale in which it acquired a 40% interest in the Venture
from Houston Deepwater Connection, Inc.

(4)     The $6,000,000 note executed by Houston
Deepwater Connection, Inc. and payable to McPherson Interests was extinguished
in full at the May 30, 2000 foreclosure sale.

(5)     As of June 14, 2000, HDI and McPherson
Interests are the sole partners in the Venture, with HDI owning a 60% interest
and McPherson Interests owning a 40% interest.

(6)     At the closing of the Asset Purchase
Agreement, the Venture received an undisclosed amount of cash and, concurrently
with the execution of the June 14, 2000 letter agreement, it distributed $250,000
of this money to McPherson Interests.

This letter agreement was signed by HDI.  James McPherson executed this agreement on
behalf of McPherson Interests as its President. 
James McPherson also signed this agreement five more times C once in his individual
capacity and also as representative of the following corporations: Jacintoport
Corporation, Coastal Terminal Operators, Inc., Coastal Stevedoring Corp., and
Diversified Laborers, Inc. 








Jacobs also produced a letter agreement
dated May 16, 2002, that is part of the summary-judgment evidence.  In this document, the parties state that they
still have not reached final agreement regarding the amounts of cash
distributions from the Venture to which HDI and McPherson Interests are entitled.  However, the document states that,
nonetheless, HDI has consented from time to time to the Venture=s distribution of
money to McPherson Interests and that HDI consents to a $600,000 distribution
from the Venture to McPherson Interests on May 16, 2002.  Jacobs also produced two $300,000 checks drawn
on the Venture=s account and made payable to McPherson
Interests.  Mc Pherson testified that, on
behalf of McPherson Interests, he endorsed these checks over to Jacintoport
Corporation and that he deposited these checks into Jacintoport=s bank
account.  

At his deposition, Jacobs testified as
follows:

(1)     The Venture definitely consummated a sale
to Seaboard Corporation.

(2)     In exchange for a payment (the amount of
which is protected by a confidentiality agreement), Seaboard purchased
virtually all of the Venture=s assets, except for an agreement under which the Venture
received royalties from a company.

(3)     Included in the assets that the Venture sold
to Seaboard were two leases the Venture had with the Port
of Houston covering two facilities
that were commonly known as AJacinto Port.@

(4)     The Venture has paid approximately $800,000
from the proceeds of the Seaboard transaction to McPherson Interests.

(5)     In connection with the Seaboard transaction,
Coastal Terminal Venture changed its name to APort Venture.@

(6)     The two checks endorsed by James McPherson
on behalf of McPherson  Interests and
dated May 16, 2002, were payments from the Venture directly related to the
sales proceeds received from Seaboard.[1]


 

At his February 27, 2001 deposition, which
is part of the summary-judgment evidence, James McPherson testified as follows:








(1)     As of February 27, 2001, McPherson Interests
owned a 40% interest in the Venture.

(2)     As of February 27, 2001, McPherson Interests
had not received from the Venture its 40% share of the sales proceeds from the
Seaboard transaction.

(3)     The proceeds from the sale to Seaboard that
are to be distributed by the Venture are the proceeds James McPherson was
referring to in his January 12, 2000 letter.

(4)     McPherson was not assisted by an attorney in
drafting his January 12, 2000 letter.

(5)     In January of 2000, Morano (President of
Essex) Aagreed for [McPherson] to pay him
out of the proceeds from Seaboard.@

(6)     Jacintoport Corporation is owned by
McPherson=s daughter, and McPherson is an
officer and a director of the company.

(7)     Jacintoport Corporation is not currently in
business and has not been in business since April of 1999.

(8)     Jacintoport Corporation is not owed any
money from the Venture.

 

At his July 9, 2002 deposition, which is
part of the summary-judgment evidence, James McPherson testified as follows:

(1)     In his January 12, 2000 letter, McPherson
did agree to pay the indebtedness to Essex out of the sale of CTV Jacintoport
to Seaboard; however, this sale was never actually consummated because the sale
changed after January 12, 2000, when Jacintoport Corporation and its assets
were not involved in the sale.

(2)     McPherson was confused at his previous
deposition (February 27, 2001), when he stated that the sale had been
consummated.

(3)     The Venture has funded $1.2 to $1.6 million
to McPherson Interests.

(4)     The original understanding was that the full
sales price from the Seaboard transaction would be funded in one lump sum;
however, it was less than anticipated, although still in excess of the debt to
Essex.

(5)     McPherson anticipated the money was going to
be funded to McPherson Interests and that McPherson Interests would then fund
the money to Coastal.

(6)     McPherson anticipated Coastal would be a
continuing, operating entity with a large volume of business, but it is not.








(7)     Out of the proceeds McPherson Interests has
received, it advanced $900,000 to satisfy in part an obligation to the Texas
Workers= Compensation Insurance Commission
owed by Jacintoport Corporation, Coastal, and McPherson in his individual
capacity.

(8)     To the best of McPherson=s recollection, McPherson Interests
was not liable on this obligation to the Texas Workers= Compensation Insurance Commission.

(9)     McPherson also used some of the distribution
of the Seaboard sales proceeds to pay his personal income taxes and some
salaries, including his own salary.

(10)    McPherson did not use the money from the
Seaboard transaction to pay Essex because the transaction did not involve one
lump-sum payment and Coastal did not have an operating facility as McPherson
allegedly anticipated.

(11)    When McPherson received the two $300,000
checks in May of 2002, he endorsed them over to Jacintoport Corporation and
deposited them in Jacintoport=s bank account.

(12)    Jacintoport then paid out Amost all of the money@ by checks that were signed by
James McPherson.

(13)    Of the $1.6 million received by McPherson
Interests from the sale to Seaboard, probably not a substantial amount is still
around.

(14)    The
two $300,000 checks, dated May 16, 2002, were not part of the proceeds that
McPherson Interests received.

No proceeds of the Seaboard transaction
were ever paid to Essex.  Coastal and
McPherson have not otherwise satisfied the obligations in question.  Essex sued Coastal for breach of the leases
and McPherson for breach of the January 12, 2000 letter agreement, which Essex
asserts is a guarantee.  Essex filed a
motion for summary judgment and a supplemental motion for summary
judgment.  The trial court granted these
motions and awarded Essex judgment against Coastal and McPherson, jointly and
severally, in the amount of $461,104.44, plus attorney=s fees, interest,
and costs.








                                            II. 
Issues Presented

On appeal, Coastal and McPherson assert
the following arguments under their first issue:

(1)     The trial court erred in granting summary
judgment because the January 12, 2000 letter agreement is ambiguous.

(2)     The trial court erred in granting summary
judgment because of genuine issues of fact regarding the defenses of failure of
consideration and mutual mistake.  

(3)     The trial court erred in granting summary
judgment because of a material fact issue regarding Essex=s alleged failure to perform a
condition precedent.

(4)     The trial court erred in granting summary
judgment because of fact issues regarding the affirmative defense of
unconscionability.

(5)     The trial court erred in granting summary
judgment because there is a genuine issue of material fact regarding the
reasonable attorney=s fees that should be awarded to
Essex for the prosecution of its contract claims.

 

Coastal and McPherson also assert a second
issue; however, that issue is now moot because the relief requested has been
granted by this court in its abatement order of April 22, 2004.  See Coastal Terminal Operators v. Essex
Crane Rental Corp., 133 S.W.3d 335 (Tex. App.CHouston [14th
Dist.] 2004, order) (per curiam).[2]









                                         III. 
Standard of Review

In reviewing the trial court=s summary
judgment, we must determine whether Essex showed there is no genuine issue of
material fact and that it is entitled to judgment as a matter of law.  See KPMG Peat Marwick v. Harrison Cty.
Housing Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999).  In conducting our review, we take as true all
evidence favorable to nonmovants Coastal and McPherson, and we make all
reasonable inferences in their favor.  See
id. 

                                         III. 
Issues and Analysis

A.      Did
the trial court err in granting summary judgment because the January 12, 2000
letter agreement is ambiguous?

McPherson asserts that summary judgment
was improper because the January 12, 2000 letter agreement is ambiguous.  Whether a contract is ambiguous is a question
of law for the court=s determination.  Heritage Res., Inc. v. NationsBank,
939 S.W.2d 118, 121 (Tex. 1996).  If the
contract is subject to two or more reasonable interpretations, the contract is
ambiguous, thereby creating a fact issue as to the parties= intent.  Columbia Gas Transmission Corp. v. New Ulm
Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996). 
On the other hand, if the written instrument is worded so that it can be
given a certain or definite legal meaning or interpretation, then it is not
ambiguous, and the court will construe the contract as a matter of law.  Coker v. Coker, 650 S.W.2d 391, 393
(Tex. 1983). 

McPherson asserts that his letter of
January 12, 2000, is ambiguous because it is susceptible to the following
interpretations:








(1)     McPherson promises that the outstanding
balance of Coastal=s debt to Essex will be paid in
full out of the proceeds from the sale of Cargo Terminal Venture/Jacintoport to
Seaboard as soon as funds from this transaction are released to a company
affiliated with McPherson, regardless of changes in the structure of the
transaction; furthermore, if such payment is not made, then McPherson will be
personally liable to pay this debt to the extent it is not paid out of these
proceeds.

(2)     McPherson promises that the outstanding
balance of Coastal=s debt to Essex will be paid in
full out of the proceeds from the sale of Cargo Terminal Venture/Jacintoport to
Seaboard as soon as funds from this transaction are released to a company
affiliated with McPherson; however, such payment need not be made if the
structure of the Seaboard transaction changes from that anticipated on January
12, 2000. 

(3)     McPherson promises to do his best to see
that the outstanding balance of Coastal=s debt to Essex will be paid in full out of the proceeds
from the sale of Cargo Terminal Venture/Jacintoport to Seaboard as soon as
funds from this transaction are released to a company affiliated with
McPherson, regardless of any unanticipated change in the structure of the
transaction. However, if McPherson=s efforts are unsuccessful, McPherson has no personal
liability under any circumstances.

(4)     McPherson
promises that the outstanding balance of Coastal=s debt to Essex
will be paid in full out of any proceeds from the sale of Cargo Terminal
Venture/Jacintoport to Seaboard as soon as funds from this transaction are
released to McPherson in his personal capacity or to Coastal.

Although 
McPherson is correct that the January 12, 2000 letter agreement is
arguably susceptible to the above interpretations, the fact that the parties
put forth conflicting interpretations does not create an ambiguity.  See Columbia Gas Transmission Corp.,
940 S.W.2d at 589.  For an ambiguity to
exist, at least two of the interpretations must be reasonable.  Id. 
We conclude that interpretations two through four, above, are not
reasonable.  See id.  








The second interpretation is not
reasonable because nothing in the letter indicates that the structure of the
transaction or the persons negotiating the transaction are relevant to the
obligation to pay Essex out of the proceeds. 
It would not be reasonable to allow McPherson to alter the obligation to
pay Essex based on variables in the transaction.  The third interpretation would render the
words A[p]lease accept
this letter as my personal guarantee . . . .@ meaningless
because there would be no possible personal liability for McPherson on his
personal guarantee. A guarantee agreement is a contract in which a guarantor
agrees to be responsible for the performance of another party even if the
guarantor does not have direct control.  Material
Partnerships, Inc. v. Ventura, 102 S.W.3d 252, 258 (Tex. App.CHouston [14 Dist.]
2003, pet. denied).  This letter is an
unusual form of guarantee because McPherson is guaranteeing that one of his
affiliated companies will use certain proceeds to pay the debt Coastal owes
Essex, rather than guaranteeing that Coastal itself will pay this debt.  Nonetheless, to give meaning to the words Apersonal
guarantee,@ there must be personal liability for
McPherson if the guaranteed performance does not occur.  See Material Partnerships, Inc., 102
S.W.3d at 258B61 & 263B64 (Frost, J.,
concurring).  Finally, the fourth
interpretation is not reasonable because there is no reason to expect that the
proceeds would be released to McPherson personally or to Coastal and it is not
reasonable for McPherson to be able to avoid liability by simply making sure
that the proceeds are not transferred to himself or to Coastal.  In sum, the competing interpretations
advanced by McPherson are not reasonable and therefore do not create an
ambiguity.  See Columbia Gas
Transmission Corp., 940 S.W.2d at 589B93; Material
Partnerships, Inc., 102 S.W.3d at 258B61 & 263B64 (Frost, J.,
concurring).   Therefore, we conclude
that the trial court did not err in its implicit ruling that the January 12,
2000 letter agreement is unambiguous.  

B.      Did the trial court err in granting
summary judgment because of fact issues regarding the affirmative defense of
lack of consideration?








McPherson also
asserts that there is a fact issue regarding his affirmative defense of lack of
consideration to support his guarantee agreement.  Although McPherson=s live pleading at
the time of the trial court=s judgment
contained a verification page, that page was not signed by McPherson or
notarized.  As a result of this pleading
defect, McPherson waived that defense.  See
Tex. R. Civ. P. 93(9); Murphy
v. Canion, 797 S.W.2d 944, 949 (Tex. App.CHouston [14th Dist.] 1990, no writ) (holding failure to assert
lack of consideration by verified denial waived that defense).  Accordingly, the trial court did not err in
granting judgment despite McPherson=s argument that
his agreement lacked consideration. 

C.      Did
the trial court err in granting summary judgment because of fact issues
regarding the affirmative defense of mutual mistake?

McPherson also asserts the trial court
erred because there is a fact issue regarding mutual mistake.  Under the doctrine of mutual mistake, when
parties to an agreement have contracted under a misconception or ignorance of a
material fact, the agreement will be avoided.  Walden v. Affiliated Computer Services, Inc.,
97 S.W.3d 303, 325B26 (Tex. App.CHouston [14th
Dist.] 2003, pet. denied).  To prove a
mutual mistake, however, the evidence must show that both parties were acting
under the same misunderstanding of the same material fact.  Id. 
Applying the familiar standard of review, we conclude that the
summary-judgment evidence did not raise a genuine issue of fact that both
parties were acting under the same misunderstanding of the same material fact.  Accordingly, the trial court did not err in
concluding that this defense fails as a matter of law.  See Walden, 97 S.W.3d at 325B26.

D.      Did
the trial court err in granting summary judgment because of fact issues
regarding Essex=s alleged failure to perform a condition
precedent?      








McPherson and Coastal also argue the trial
court erred in granting summary judgment because of a material fact issue
regarding Essex=s alleged failure to perform a condition
precedent.  Because Essex pleaded that
all conditions precedent had been performed, Essex was required to prove only
the conditions precedent that McPherson or Coastal specifically denied.  See Tex.
R. Civ. P. 54.  In their answers,
Coastal and McPherson did not deny that Essex failed to perform any specific
alleged condition precedent; rather, they Aspecifically
den[ied] that all conditions precedent to Plaintiff=s right to recover
have occurred or been performed.@  This denial, however, is not sufficient under
Texas Rule of Civil Procedure 54.  See
Tex. R. Civ. P. 54; Wade and
Sons, Inc. v. American Standard, Inc., 127 S.W.3d 814, 825B26 (Tex. App.CSan Antonio 2003, pet.
denied).  Rule 54 requires the opposing
party to specifically deny which conditions precedent have not been performed or
have not occurred.  See Tex. R. Civ. P. 54.  To require the pleading party to prove an
alleged condition precedent, the opposing party must specify in its denial the
conditions precedent that allegedly have not been satisfied; it is not
sufficient to simply deny that all conditions precedent have been satisfied,
even if the word Aspecifically@ is included in
the denial.  See Tex. R. Civ. P. 54; Wade and Sons,
Inc., 127 S.W.3d at 825B26.  Because they did not specify in their denials
any conditions precedent that allegedly had not been satisfied, McPherson and
Coastal waived their right to complain on appeal about any alleged failure to
satisfy conditions precedent.  See
Tex. R. Civ. P. 54; Wade and
Sons, Inc., 127 S.W.3d at 825B26. 

E.      Did
the trial court err in granting summary judgment because of fact issues
regarding the affirmative defense of unconscionability?








McPherson also asserts that there is a
fact issue regarding whether enforcing his January 12, 2000 letter agreement
against him would violate public policy and be unconscionable because there is
a genuine issue of fact as to whether he received or controlled any proceeds
from the transaction referenced in that agreement.  The high threshold of proof required of
McPherson to prove unconscionability is well-established,  as is the strong policy of Texas in favor of
freedom of contract.  See Marsh v.
Marsh, 949 S.W.2d 734, 740 (Tex. App.CHouston [14th
Dist.] 1997, no writ) (stating burden of proof that must be satisfied by party
alleging unconscionability); Churchill Forge, Inc. v. Brown, 61 S.W.3d
368, 371 (Tex. 2001) (stating that Texas has a Astrong commitment
to the principle of contractual freedom@).  McPherson has not shown that he signed the
January 12, 2000 letter agreement as a result of mutual mistake, fraud, or
oppression or that the agreement is so one-sided that it rises to the level of
substantive unconscionability.  See
Marsh, 949 S.W.2d at 739B43 (stating that
disproportionate terms and unfairness alone is not sufficient to show
unconscionability and holding that agreement was not unconscionable).  A party who knowingly enters a lawful but
improvident contract is not entitled to protection by the courts, and absent
mistake, fraud, or oppression, the courts are not interested in the wisdom of
contracts voluntarily entered into between parties compos mentis
and sui juris.  See id. at
740.  We conclude that, as a matter of
law, the January 12, 2000 letter agreement is not unconscionable.  Accordingly, the trial court did not err in
rejecting McPherson=s unconscionability argument.

F.       Did
the trial court err in granting summary judgment because there is a fact issue
regarding attorney=s fees?

McPherson and Coastal assert that there is
a fact issue precluding summary judgment as to the reasonable attorney=s fees that should
be awarded to Essex for prosecution of this suit in the trial court.  They also claim that the statements in Essex=s attorney=s fees affidavit
regarding appellate fees are conclusory, making summary judgment improper as to
these fees.  We agree with both
assertions.








In his affidavit, Essex=s attorney
established a prima facie case for recovery of attorney=s fees for
prosecution of this suit in the trial court. 
In the absence of controverting proof, this affidavit would have been
sufficient to support the trial court=s summary
judgment. See Bethel v. Butler Drilling Co., 635 S.W.2d 834, 841 (Tex.
App.CHouston [14th
Dist.] 1982, writ ref=d n.r.e.). 
However, the affidavit of appellants= attorney
constituted controverting expert testimony and raised a genuine issue of
material fact regarding the reasonable attorney=s fees that should
be awarded to Essex for prosecution of this suit in the trial court.  See Engel v. Pettit, 713 S.W.2d 770,
771B73 (Tex. App.CHouston [14th
Dist.] 1986, no writ) (holding that trial court erred in granting summary
judgment because of fact issue raised by attorney=s fees affidavit
of nonmovant).  Essex asserts that the
controverting affidavit is invalid and insufficient to raise a fact issue  because it does not state that the facts set
forth therein are true and correct. 
Essex does not cite, and we have not found, any place in the record
where Essex objected on this basis in the trial court or any order ruling on
such an objection.  Therefore, Essex has
waived this objection.  See Tex. R. Civ. P. 166a (f); Grand
Prairie Indep. Sch. Dist. v. Vaughn, 792 S.W.2d 944, 945 (Tex. 1990)
(stating objection based on affidavit=s failure to explicitly
state that it was based on personal knowledge and that witness was competent
was waived by failure to object in the trial court); Youngblood v. U.S.
Silica Co., 130 S.W.3d 461, 468B69 (Tex. App.CTexarkana 2004,
pet. filed) (holding objection based on affidavit=s failure to
explicitly state that statements therein were Atrue and correct@ and within
affiant=s personal
knowledge was waived by failure to object and obtain ruling in the trial
court).  We conclude there is a genuine issue
of material fact precluding summary judgment as to reasonable attorney=s fees in the
trial court.

As to the appellate fees, McPherson and
Coastal assert that summary judgment was not proper because Essex provided only
conclusory statements in its counsel=s affidavit to
support the reasonableness of these fees. 
We have reviewed this affidavit, and we conclude that the statements
regarding appellate fees are conclusory and that there is no evidence to
support the reasonableness of these fees. 
See Burrow v. Arce, 997 S.W.2d 229, 235B37 (Tex. 1999)
(holding that conclusory affidavits made by an expert are legally insufficient
to support summary judgment); Ramirez v. Transcontinental Ins. Co., 881
S.W.2d 818, 829 (Tex. App.CHouston [14th
Dist.] 1994, writ denied) (holding party need not assert objection in trial
court to argue on appeal that language in affidavit is conclusory).  Therefore, we conclude that the issue of the
amount and reasonableness of the trial and appellate attorney=s fees to be
awarded Essex should be severed and remanded to the  trial court for trial.  

                                                IV. 
Conclusion








The January 12, 2000 letter agreement is
unambiguous.  The trial court did not err
in granting summary judgment and rejecting appellants= arguments based
on failure of consideration, mutual mistake, conditions precedent, and
unconscionability.  However, Essex did
not conclusively prove its entitlement to reasonable attorney=s fees.  Accordingly, as to the attorney=s fees issue only,
we sustain the first issue asserted by McPherson and Coastal and reverse the
trial court=s judgment.  We sever and remand for trial the issue of
the amount and reasonableness of the trial and appellate attorney=s fees to be
awarded Essex.  In all other respects, we
affirm the trial court=s judgment.

 

 

 

/s/      Kem Thompson Frost

Justice

 

Judgment
rendered, Memorandum Opinion of June 29, 2004, Withdrawn, and Substitute
Memorandum Opinion filed August 12, 2004.

Panel consists
of Justices Edelman, Frost, and Guzman (Edelman, J., concurs without filing an
opinion).  

 

 

 











[1]  The transcript
of Jacobs=s deposition is part of the summary-judgment evidence.





[2]  In response to
this court=s abatement order, the trial court severed appellants= counterclaim. 
In its motion for rehearing, Essex continues to argue that the trial
court=s summary judgment was final when signed on August 23,
2002.  We stand by the analysis in our
abatement order.  Moreover, we
note that Essex could have avoided these issues concerning the judgment=s finality by either including in its proposed
judgment language stating with unmistakable clarity that the judgment was final
or by obtaining a ruling on Essex=s motion
to strike or sever the counterclaim.  On
August 23, 2002, the trial court signed, without modification, the proposed
summary judgment that Essex submitted with its Supplemental Motion for Partial
Summary Judgment.  This proposed judgment
contained the kind of AMother Hubbard@ clause
that the Texas Supreme Court has held does not make a summary judgment
final.  See Lehmann v. Har-Con Corp.,
39 S.W.3d 191, 203B06 (Tex. 2001). 
If this proposed judgment had stated that it Afinally disposes of all parties and all claims and is
appealable,@ then that language alone would have made the judgment
final.  See id.  Essex never requested that the trial court=s judgment include such language.  Furthermore, on August 23, 2002, Essex filed
a motion to strike the late-filed counterclaim or, in the alternative, to sever
the counterclaim Aso that [Essex=s] Summary
Judgment is final.@  However,
according to its motion for rehearing, Essex later advised the trial court that
it was unnecessary to rule on this motion, and the trial court never ruled on
it.  Rule 63 requires the filing party to
obtain leave to file pleadings late under a Rule 166 scheduling order just as
Rule 166a(c) requires leave to file pleadings after a summary-judgment hearing
but before the judgment is signed.  See
Tex. R. Civ. P. 63 (Ashall be filed only after leave of the judge is
obtained . . . .@); Tex. R. Civ.
P. 166a(c) (Aor filed thereafter and before judgment with
permission of the court. . . .@).  Yet, for a
summary judgment to be final, it must dispose of claims even if they are filed
without the leave of court required under Rule 63.  See Guajardo v. Conwell, 46 S.W.3d
862, 863B64 (Tex. 2001); Tex.
R. Civ. P. 63.  Essex also could
have avoided these finality issues by promptly obtaining a severance.