# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00407-CV

**Edgar W. Howard, Sr., Appellant**

**v.**

**Sunset Life Insurance Company of America, Appellee**

## FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
## NO. 20451, HONORABLE GUILFORD L. JONES, III, JUDGE PRESIDING

Edgar W. Howard, Sr. filed this lawsuit on behalf of himself and a putative class of others similarly situated. He claims that Sunset Life Insurance Company of America ("Sunset Life") breached an insurance contract by raising his premiums in violation of certain policy provisions which exclusively give him the right to increase his premiums. The parties filed competing motions for summary judgment. The trial court granted Sunset Life's motion and denied Howard's. We will affirm.

## BACKGROUND

In November 1985, Howard applied for a universal life insurance policy with a $50,000 death benefit to be issued by Sunset Life. However, because of Howard's history of heart problems, Sunset Life issued a policy with only a $25,000 death benefit. Sunset Life issued the policy in March 1986. The policy stated that it was a Flexible Premium Adjustable Death Benefit Life

Policy. The crux of this dispute concerns the "flexible premium" provisions of the policy. Howard contends that the policy, by its terms, gives the policyholder the exclusive right to determine and later change the amount of premiums. He further contends that because Sunset Life required him to increase his premiums in 1994 and threatened to raise his premiums again in 1998, Sunset Life breached the policy.

Furthermore, Howard contends that the policy's maturity date is January 21, 2022, the minimum premium payment due is $10, and the policy will terminate either upon his death or on the maturity date. Howard argues that the minimum payment of $10 is, by Sunset Life's own policy terms, the lowest amount necessary to maintain full coverage until maturity. He claims that by paying over ten times more than the minimum, he was merely adding value to his policy. We believe that Howard misreads the plain language of the policy.

The premium and reinstatement provisions of the policy provide that Howard must make his first premium payment upon delivery of the policy in order to activate coverage. Then, in the section dealing with the amount and frequency of premium payments, the policy states:

> You may change the amount of planned premium payments at any time. Each planned premium payment must be at least equal to the minimum premium payment shown on page 3.[1]
>
> We reserve the right to limit the amount of any increase.
>
> You may change the frequency of planned premium payments at any time. Each premium payment will be credited by us as described in Section 10.

---

[1] The minimum premium payment as shown on page three of Howard's policy is $10.

(Footnote added.) Similar language appears in the definitions section of the policy, except that in the definition of "planned premium payments," the following statement is included: "The actual amount and frequency of premium payments will affect the cash values and amount and duration of insurance." This gave policyholders like Howard notice that decisions regarding the "planned premium payment" would affect how long the policy remained in effect.

The terms of the policy provided that Sunset Life would deduct its monthly expenses and costs of insurance from Howard's premiums each month.[2] If the premiums exceeded the monthly deduction, the policy would build cash value which earned interest at market rates.[3] However, in

---

[2] The policy defines "monthly deduction" in section 4.13 as:

The amount we deduct on the monthly anniversary day from the cash value to pay the cost of insurance, expenses and the cost of any additional benefits provided by riders for the month beginning on that monthly anniversary day.

[3] Section 10.2 of the policy explains "cash value."

On each monthly anniversary day the cash value will be equal to:

$$A + B + C - D$$

On any day other than a monthly anniversary day, the cash value will be equal to:

$$A + B + C$$

"A" is the cash value on the preceding monthly anniversary day.

"B" is the net premiums received since the preceding monthly anniversary day.

"C" is interest on "A" from the preceding monthly anniversary day plus interest on each net premium in "B" from the date of receipt of each premium at our Home Office.

"D" is the monthly deduction (as described in Section 10.4) for the month beginning on that monthly anniversary day.

months where the premium payment was insufficient to cover the monthly deduction, a portion of the cash value would be applied to cover the difference. As the decision-maker regarding the flexible premiums, it was incumbent on Howard to monitor his policy and ensure he was paying sufficient premiums to maintain the policy. In an effort to assist him, and all of its policyholders, Sunset Life sent various correspondence dealing with the premiums and cash value of the policy.

In March 1986, along with a copy of the policy which Sunset Life sent Howard for approval and acceptance, it presented him with a benefit and premium schedule which set out the *then-existing* policy expenses and costs of insurance. Based on this schedule, Sunset Life *recommended* an initial monthly planned premium of $105.77. This amount was expected to sufficiently sustain the policy for a limited time; Sunset Life estimated that the premium would only carry the policy past the second year since costs were expected to increase over the term of the policy. Sunset Life notified Howard of this estimate in a statement of policy costs and benefits information that accompanied the policy. The statement provided that "based on guaranteed values, policy terminates during year 2, unless a higher premium is paid." Howard agreed to have Sunset Life automatically withdraw, by bank draft, the initial planned premium from his bank account each month.

In addition to the initial premium schedule, the policy provided that Sunset Life would send Howard an annual report regarding his policy. This annual report showed, in part, the current cash value of the policy, premiums paid, interest credited, and all deductions made during that

4

reporting year.[4] These reports were issued as a means by which Howard could monitor his policy's value and determine whether his premium payments were sufficient to maintain coverage. For example, an increasing cash value indicated that the premiums paid over the course of the year sufficiently covered the policy costs and expenses. Conversely, a declining cash value balance indicated that the cash value account was being depleted because the amount of the monthly premium was insufficient to cover the monthly deduction.

Instead of simply relying on Howard and its other policyholders to monitor their policies through these annual reports, Sunset Life tested all of its policies annually to identify those in danger of lapsing. When a policy was found to be in danger of lapsing, Sunset Life sent a letter along with an additional annual report to inform the owner of such danger and to *suggest* a premium that would be sufficient to continue coverage. With this notice, the policyowner then had the option either to increase the premium to meet the increased costs and expenses or to terminate coverage.

Despite Sunset Life's projection that Howard's policy would terminate during its second year unless the premium was increased, the initial planned premium of $105.77 proved sufficient to cover Howard's policy costs and expenses until February 1994, almost eight years from inception. However, according to the annual report for the year ending in March 1994, the beginning balance of the cash value account for the month of February 1994 was $24.35. The premium paid

---

[4] The provision governing Sunset Life's obligation to send Howard an annual report is found in section 6.7 of the policy. That section also provides that Howard may, at any time, receive a report upon submitting a written request and tendering a reasonable fee as determined by Sunset Life.

5

was $105.77 and Howard earned $.11 interest on the account that month for a total cash value of $130.23. The expense charges for the period were $10.43 and insurance costs were $123.35, requiring a $133.78 monthly deduction. Therefore, Howard's total cash value failed to cover the total monthly deduction.

On April 5, 1994, a policy service representative from Sunset Life sent Howard a letter informing him that the planned monthly premium he had been paying since the policy went into effect could no longer sustain his policy. The letter explained that "[t]he monthly cost of insurance and expenses are exceeding $105.77 and the balance is being deducted from the policy's cash value each month." Howard was informed that because that value had been depleted, the policy would terminate on April 23, 1994 unless Howard paid a higher premium. The letter then told Howard, "To bring the premium payments current, we have changed your automatic bank check withdrawal to the minimum premium amount of $156.68, effective with the April withdrawal." Howard claims that Sunset Life's action by this letter was a breach of the policy provisions because only he could elect to raise his premium payment. Howard did sign an authorization agreement for the automatic withdrawal of the increased premiums from his bank account, *but* he maintains that he was forced to do so under duress.

The increased premium sufficiently covered Howard's policy costs and expenses until the Spring of 1998. At that time, Howard received two letters regarding his policy. The first letter, dated March 24, 1998, was from Sunset Life. In it, Sunset Life reminded Howard that an annual audit of his policy was required to determine whether any changes were required. The letter also explained again how the flexible premium provisions of his policy operated. Sunset Life then

6

recommended, "To prevent the loss of your life insurance, we encourage you to contact [your agent] to review your coverage and determine what action needs to be taken." The second letter, dated April 3, 1998, was from Howard's insurance agent. That letter opens by informing Howard that Sunset Life evaluated his policy and determined that it may be in danger of lapsing within the next *ten years*. The letter then explains that insurance costs have changed and that Howard may want to reassess his financial and retirement goals and needs. The letter concludes with an *invitation* for Howard to contact the agent to discuss the services offered. Neither letter suggested that the policy was in immediate danger of lapsing, nor did either letter suggest a specific premium increase.

In response, Howard sent Sunset Life a letter cancelling his policy which included the following statements:

> It was never explained to me from the beginning that this was a type of policy that the premiums could be increased again and again. Nor was it explained four years ago when the premium was raised to $156.68. Now, at age 71, you explain that the "policy is in danger of lapsing in the next few months" (your letter of April 8, 1998) and the premium must be raised again now, again when I reach the age of 75, again when I reach the age of 79, and again and again after that!

> I asked about the possibility of decreasing the coverage, but your letter of May 20, 1998, states, "decreasing coverage under your current policy is not an option for you." The options that you did offer were not acceptable because the premiums were going to continue to increase.

We note that neither letter referenced by Howard appears in the record. The record before this Court contains no correspondence from Sunset Life suggesting that a lapse in coverage was imminent or decreasing coverage was an impossibility. Howard concludes his letter by notifying Sunset Life that

he had contacted the Texas Department of Insurance in order to file a complaint and recover the premiums he had paid Sunset Life.[5]

In November 2000, Howard filed his petition alleging, on behalf of himself and a putative class of others similarly situated, that Sunset Life breached the insurance contract by increasing the premium, was unjustly enriched by receiving the increased premium payments, and breached its duty of good faith and fair dealing. Howard sought damages and injunctive and declaratory relief. Sunset Life filed a motion for summary judgment seeking a final determination on all of Howard's claims. Howard filed a competing motion for summary judgment. After reviewing the motions, responses, and summary judgment evidence, the trial court granted Sunset Life's motion and denied Howard's motion.

## DISCUSSION

In Texas, insurance contract interpretation is governed by general contract interpretation rules. *Texas Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999); *see also Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 740-41 (Tex. 1998). Our goal is to give effect to the written expression of the parties' intent, viewing the contract in its entirety, consistent with applicable rules of law. *Texas Farmers,* 996 S.W.2d at 879. Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). An ambiguity does not arise simply because the parties advance

---

[5] The Texas Department of Insurance took no action against Sunset Life in response to Howard's complaint.

8

conflicting interpretations of the contract. *Id.* Although Howard and Sunset Life disagree as to the general interpretation of the flexible premium provisions in the policy, we do not believe that this insurance contract is ambiguous.

Howard contends that the plain language of the policy reserves sole authority to raise premiums to the policyholder. Howard's reading of the policy suggests that by including a minimum monthly premium of $10, Sunset Life thereby *guaranteed* that it would provide the $25,000 death benefit as long as Howard's premium exceeded that minimum. This interpretation does not conform to the written provisions and general intent of the insurance contract. The policy clearly explains that the owner must pay premiums sufficient to cover the monthly deduction[6] in order for the policy to avoid having a negative cash value and entering the grace period.[7] And while the policy gives the owner the right to change the planned premium payment, it does not preclude Sunset Life from monitoring the cash value of the policy and making appropriate suggestions to the owner regarding the required amount of premium. In fact, the intent of the policy requires that both the owner and Sunset Life monitor the policy to ensure that the premium being paid is sufficient to continue coverage. The policy imposes a duty on Sunset Life to create and submit annual reports to Howard so that he could monitor his policy's cash value. Furthermore, as occurred here, when the policy was

---

[6] Section 4.8 states, in relevant part, "The actual amount and frequency of premium payments will affect the cash values and the amount and duration of insurance."

[7] The grace period is defined as a thirty-one-day term that the policy enters if the premium and the cash value are insufficient to cover costs and expenses. By entering the grace period, the policy remains in effect even though the cash value of the policy is negative. The grace period allows the policy owner the opportunity to pay a sufficient premium to cover the monthly deduction without having the policy terminate due to lack of funds. This situation occurred once with respect to Howard's policy as was evidenced by Sunset Life's letter of April 5, 1994.

9

in danger of lapsing, Sunset Life gave Howard notice that the policy had entered the grace period and additional payments were required to sustain the policy. Along with this notice, Howard received an annual report informing him that his coverage was in risk of termination. The ultimate choice to increase premiums or terminate the policy remained with Howard.

Howard disagrees with this evaluation of his policy and, in his first point of error, he claims that Sunset Life breached the insurance contract by unilaterally increasing the premium in 1994 and again in 1998.[8] Sunset Life's letter of April 5, 1994 informed Howard that "we have changed your automatic bank check withdrawal to the minimum premium amount of $156.68." Howard contends that by increasing his bank draft premium by $50.91, Sunset Life breached the policy.

However, when Howard first obtained coverage under the policy in 1986, Sunset Life notified him that a premium increase was likely after the first two years of coverage. In 1994, a full eight years later, that premium increase became necessary. The evidence shows that Sunset Life did in fact raise Howard's bank draft premium from $105.77 to $156.68. But the summary judgment record affirmatively demonstrates that Howard authorized the increase in his bank draft. Howard did not exercise his option to withdraw his bank draft authorization. Additionally, at the very least, the summary judgment evidence establishes that Howard acquiesced to Sunset Life's suggested increase in his premium.

---

[8] Although Howard claims that Sunset Life breached the insurance contract again in 1998, there is no evidence in this record that could establish such a claim. Sunset Life's letter of March 24, 1998 did not contain any language informing Howard that Sunset Life was raising the bank withdrawals again, nor did it suggest there was a need to raise the premiums because the policy was in immediate danger of lapsing. This letter only suggested he contact his agent to discuss the policy. Sunset Life did not increase the premium.

This acquiescence ratified Sunset Life's conduct which Howard now complains of as a breach. Ratification is the adoption or confirmation by a person, with knowledge of all material facts, of a prior act that did not then legally bind that person and which that person had the right to repudiate. *Lesikar v. Rappeport*, 33 S.W.3d 282, 300 (Tex. App.—Texarkana 2000, pet. denied). Ratification may be either express or implied, but it must result from acts clearly evidencing an intention to ratify. *Id.* Sunset Life's letter informed Howard that he must raise his premiums in order to sustain coverage. Under the policy, Howard could have allowed the policy to lapse, authorized Sunset Life's withdrawal of the $156.68 from his bank account, or cancelled the bank draft authorization and sent his premium payment directly to Sunset Life in an amount he determined to be sufficient to maintain his coverage. The summary judgment evidence shows that Howard expressly ratified Sunset Life's withdrawal of an increased premium when he signed the authorization form.

Finally, even assuming that Sunset Life's conduct in 1994 was actionable under the policy, Howard did not file suit until 2000. The applicable statute of limitations required Howard to file suit within four years. Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (West 1997). Howard filed this suit over two and one-half years after limitations had run. Therefore, we overrule Howard's first issue and conclude that the trial court correctly ruled against Howard on his breach of contract claim.

In his remaining issues, Howard claims that Sunset Life was unjustly enriched by receiving the increased premium and breached its duty of good faith and fair dealing. Success for each remaining claim depends on finding that Sunset Life breached its contract with Howard and that suit was properly filed. Having found that Howard does not have a viable cause of action against Sunset Life for breach of contract, we need not reach the remaining issues. *See* Tex. R. App. P. 47.1.

11

## CONCLUSION

Because Howard ratified Sunset Life's conduct in 1994 and then failed to file suit within the applicable limitations period, Howard cannot maintain this lawsuit. We therefore affirm the judgment of the trial court.

_____

Mack Kidd, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed:   January 10, 2002

Do Not Publish