STEPHEN A. HIGGINSON, Circuit Judge,
concurring in part and dissenting in part:
Texas contract law directs courts to “ascertain and give effect to the parties’ intentions as expressed in” the contract at issue, “bearing in mind the particular business activity sought to be served” and “avoidfing] when possible and proper a construction which is unreasonable, inequitable, and oppressive.” Frost Nat’l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 311-12 (Tex.2005) (quoting Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex.1987)). And “[wjhether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.” Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex.1996). Applying these principles, I respectfully disagree with the majority opinion’s interpretation of the following clause:
If DTC grants to any other Person a license to any of the Licensed Patents, it will so notify JPMC, and JPMC will be entitled to the benefit of any and all more favorable terms with respect to such Licensed Patents. JPMC agrees that $.02 to $.05 per Transaction is a reasonable royalty under the license granted herein. The MFL shall be applied within thirty (30) days from the date this provision is recognized....
In light of the prospective language of the MFL clause, case law interpreting similar language, and the implausibility that the parties would have agreed to MFL language that functions as JPMC argues, I would hold — consistently with every other court to have interpreted a similar clause — that JPMC is not entitled to recoup sums paid before DTC granted any lower-priced license.
We have addressed a similarly worded clause before and reached a conclusion opposite to that which the majority reaches today — indeed, at oral argument, JPMC conceded that the reasoning behind the only Fifth Circuit authority in this area was “troubling” for its position. In Roth-stein v. Atlanta Paper Co., Rothstein licensed its bottle-carrier patent to Atlanta in exchange for a three-percent royalty on Atlanta’s sales. 321 F.2d 90, 91-92 (5th Cir.1963). The license agreement included this MFL clause:
Atlanta shall be entitled to be in as favorable a position as any other manufacturer or seller of bottle carriers, wherefore any more favorable terms of conditions as to royalties that have been or hereafter may be granted to others who are licensed under said patent auto *1021 matically shall become available to Atlanta. ...
Id. at 92. About three years later, Atlanta asked about the terms of a settlement involving the same patent and learned that Rothstein had granted a competitor a paid-up license for $8,000. Atlanta “claimed [the right to] identical treatment with the result that it would be refunded all sums theretofore paid as royalty over and above $8,000.” Id. at 93. This court held that Atlanta was entitled to a prospective license for $8,000, with credit for sums paid after the second license was granted, but rejected the argument that Atlanta could recover all royalties it paid in excess of $8,000 since the beginning of its own license, including before the second license was granted. Id. at 96. We held that “[t]he only reasonable construction” of the MFL clause was that it did “not operate retrospectively.” Id. We also suggested that the evident purpose of the clause— preventing Atlanta from being at a “competitive disadvantage” — -was consistent with prospective application because “there was a built-in gap until others were licensed.” Id.
Citing Rothstein, a district court applying Texas law recently reached the same conclusion analyzing a similar MFL clause that read in relevant part:
If after the Effective Date, Licensor shall enter into a License Agreement with any third party in the same Field of Use as Licensee ... on financial terms that are more favorable to such Third Party Licensee than the financial terms set forth in this Agreement, Licensee shall be entitled to substitute the financial terms of such Third Party License for the counterpart or equivalent terms herein....
Epic Sys. Corp. v. Allcare Health Mgmt. Sys., Inc., No. 4:02-CV-161-A, 2002 WL 31051023, at *3 (N.D.Tex. Sept. 11, 2002). Although the MFL clause in Epic — like the one in Rothstein--did not expressly preclude retroactive application, the court concluded that the most-favored licensee “[was] not entitled to credit for royalty payments made prior to the making of an election” of more favorable terms. Id. at *6; see also, e.g., Harley C. Loney Co. v. Mills, 205 F.2d 219, 219-21 (7th Cir.1953); Univ. Oil Prods. Co. v. Vickers Petroleum Co. of Del., 19 A.2d 727, 729 (Del.Super.Ct.1941).
The majority justifies a different result here, reasoning that because JPMC did not pay a running royalty rate, applying a later-granted license’s price term retroactively to the beginning of JPMC’s license is necessary to avoid making the MFL clause “effectively meaningless.” As a corollary, the majority deems inapposite the many cases holding that a most-favored licensee cannot recoup payments made before the subsequent license was granted. I perceive two problems.
I.
First, whatever the case might be with a different license granted in exchange for a single lump-sum payment, this MFL clause would not be “meaningless” if it only applied prospectively. Unlike some MFL clauses that are limited to price terms, this one entitled JPMC to “the benefit of any and all more favorable terms” in any subsequent license. See 1 Alan S. Gutterman, Going Global § 13:66 (2015) (noting that “the scope of [an] MFL clause usually extends to all other material conditions,” not just the royalty rate); cf. Epic, 2002 WL 31051023, at *3 (referring only to “financial terms”); Cameron Int’l Corp. v. Vetco Gray Inc., No. 14-07-00656-CV, 2009 WL 838177, at *1 (Tex. App. Mar. 31, 2009) (referring only to “royalty terms”). The eleven-page license agreement, which also incorporates a set *1022 tlement and release agreement between the parties, contains nonprice provisions that could have been drafted more favorably to JPMC. But even taking the position that the MFL clause here concerns only price, reading the clause as meaningless requires eliding not only the MFL clause’s prospective language, but also the contract’s actual consideration terms. Notably, the majority argues that DTC’s interpretation is unreasonable because “if JPMC had simply made a single $70 million payment in 2005 rather than spreading that amount out over several years of installment payments, JPMC never would have been able to invoke the MFL clause to obtain a better price term.” But in fact — and unlike with Cathay’s license, which the majority claims is materially identical except for the dollar amounts involved — most of JPMC’s consideration was to be paid in annual installments, the last due seven years after JPMC’s license began. And if any of the subject patents was found invalid during that seven-year period, JPMC would have been excused from its remaining payments — a benefit not available to other DTC licensees such as Cathay that negotiated one-time lump-sum payments.
Because of this payment structure, which is evident from the face of the contract, applying this MFL clause prospectively (as has every other court to consider an MFL clause) would entitle JPMC to substantial cost benefits based on any licenses granted in the first seven years of the[1] parties’ agreement. As explained more fully below, under this reading, the “benefit of’ more favorable price terms to which JPMC “will be entitled” is the same benefit that a later lump-sum licensee gets upon conferral of its license: the right to unlimited use of the subject patents from that point until those patents expire, in exchange for a certain price. See Benefit, BlaCK’s Law DiotionaRY (10th ed. 2014) (“The advantage or privilege something gives; the helpful or useful effect something has”). Especially given that another provision of the. parties’ agreement (the invalidity clause mentioned above) protected JPMC against future payments only during this seven-year period, I would hold that DTC’s reading of the MFL clause is reasonable, and the clause ambiguous. See Columbia Gas, 940 S.W.2d at 589 (explaining that contract language is ambiguous if it is “subject to two or more reasonable interpretations” and that the question of ambiguity “must be decided by examining the contract as a whole”).[1]
Reading the MFL clause’s language in the context of the rest of the contract thus shows that DTC’s interpretation is reasonable. And though consideration of parol evidence would not be permitted if the contract at issue were facially susceptible to only one reasonable meaning, see id., post-contracting events in this case are illustrative. In January 2006, DTC granted NCR Corporation a license for $2.85 million. At that point, JPMC had $40 million in scheduled payments remaining. If the parties had then applied the MFL clause, JPMC instead would have been entitled to a license going forward for $2.85 million in additional payments — saving the bank over $37 million. The clause, interpreted prospectively, would have provided similar price protection based on dozens of other licenses DTC granted be *1023 fore JPMC made its final payment on May 22, 2012. That hardly seems meaningless.
II.
Second, in its attempt to give meaning to the MFL clause, the majority renders effectively meaningless the contract’s consideration terms. It is undisputed that, at the time JPMC obtained its nonexclusive license, DTC planned to grant other licenses. A press release announcing JPMC’s settlement and license — issuance of which was a term of the parties’ agreement— mentioned other pending lawsuits involving the same patents and warned that “a complaint for infringing DTC’s patents should be interpreted as a formal invitation to either license or litigate.” Over the course of the next eight years, DTC granted almost fifty other licenses covering the same patents, one for just $39,500. Only one of these subsequent licenses cost half as much as JPMC’s, and over a dozen cost less than $100,000. It strains credulity that, given this business plan, DTC negotiated such a sizable and carefully structured payment plan with JPMC, the bulk of which would amount to nothing more than a loan — to be repaid within thirty days — as soon as DTC granted a less expensive license, no matter that the subsequent license covered a shorter time span of use.
In this regard, it is important to remember what DTC was selling: the right to use certain technology during the finite terms of its patents. It appears that the two patents named in JPMC’s license agreement are set to expire in June 2016 and March 2017, respectively. See U.S. Patent. No. 5,910,988; U.S. Patent No. 6,032,137. JPMC, which acquired a license in June 2005, bought the right to use that technology for more than seven years longer than did Cathay, which acquired its license in October 2012.[2] As the majority opinion states, “[t]he purpose of a most-favored-licensee clause is to protect a licensee from a competitive disadvantage resulting from more-favorable terms granted to another licensee.” Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 13 (2d Cir.1997). I cannot discern how the grant of Cathay’s license in 2012 placed JPMC at a competitive disadvantage during the previous seven years — a period during which JPMC’s use of the licensed technology appears to have been substantial, as by 2013, JPMC was processing over five billion check images per year. Moreover, under JPMC’s interpretation, the MFL clause would require the same $69 million refund if DTC had granted Cathay its license just a month before the licensed patents expired.
III.
The majority opinion endorses JPMC’s theory that the MFL clause in this manifestly nonexclusive license agreement unambiguously gave JPMC the right to pay nothing for its use of the subject patents during the period between the grant of its license and DTC’s last grant of a lower-priced license, however many years later that might come. Put differently, JPMC’s theory is that this MFL clause gave it the right to pay the same amount for a much longer (and thus much more valuable) license. This interpretation, at odds with the clause’s prospective language and our case law interpreting a similar clause, strongly discourages licensing, especially to small competitors, as a licensor that had granted one non-running-royalty license *1024 with an MFL clause stands to lose significant money by granting a cheaper license to a smaller entity, even several years later.
No contractual text requires, and no pri- or case even suggests, this result, which could not have been the parties’ mutual intention at the time of contracting. Further, a reasonable alternative construction exists: that the MFL clause gave JPMC the benefit of more favorable nonprice terms for the duration of its license, and— like the clause excusing the bank from further payments after a final judgment of patent invalidity — protected JPMC with regard to more favorable price terms during the seven years over which it made payments. Accordingly, I would reverse the district court’s holding that the MFL clause unambiguously entitled JPMC to a refund of nearly all payments it made since the beginning of its license.[3]

. To the extent JPMC made payments in excess of a more favorable license after it was granted, it would be entitled to recover those overages. See Epic, 2002 WL 31051023, at *6. For that reason, the majority’s citation of a commentator’s statement that MFL clauses can lead to "refunds” is no answer to the argument that this MFL clause was not intended to operate retroactively.

. Even if JPMC's and Cathay’s licenses are extended — which JPMC suggests is possible, but does not contend actually has happened or will happen — JPMC will still have gotten over seven more years of licensed use of the technology than Cathay.

. I concur in parts III.B and III.C of the majorily opinion.