**REVERSE and REMAND; Opinion Filed December 4, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00721-CV

**MARK A. TICER D/B/A LAW OFFICES OF MARK A. TICER, Appellant**
**V.**
**REED MIGRAINE CENTERS OF TEXAS, PLLC, KENNETH L. REED, M.D., NEURO STIM TECHNOLOGIES, LLC, CASEY GRIFFITH, AND KLEMCHUK KUBASTA, LLP, Appellees**

**On Appeal from the County Court at Law No. 2**
**Dallas County, Texas**
**Trial Court Cause No. CC-17-03338-B**

## MEMORANDUM OPINION

Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Schenck

Mark A. Ticer d/b/a Law Offices of Mark A. Ticer (Ticer or "LOMAT") appeals the summary judgment dismissing his claims against appellees Reed Migraine Centers of Texas, PLLC, Kenneth L. Reed, M.D., Neuro Stim Technologies, LLC, Casey Griffith, and Klemchuk Kubasta, LLP ("Klemchuk"). In his first issue, Ticer argues the trial court erred in granting appellees' traditional motions for summary judgment on the affirmative defense of release. In his second issue, Ticer urges the trial court erred in granting summary judgment against him on causes of action not addressed in the motions for summary judgment. In his third issue, Ticer maintains the trial court abused its discretion by severing his claims against appellees and appellees' claims against Ticer. We reverse the trial court's judgment and its order granting severance and remand

for further proceedings.  Because all issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

## BACKGROUND

Appellee Dr. Kenneth Reed created a procedure for treating migraine headaches known as the Reed Procedure.  Dr. Reed, through one or more of his entities and fellow appellees Neuro Stim Technologies, LLC ("Neuro Stim") and Reed Migraine Centers of Texas, PLLC ("Reed Migraine") (collectively, the "Reed Parties"), had an exclusive contractual arrangement with University General Hospital ("UGH") to perform the Reed Procedure at UGH's facility in exchange for a share of net revenues.  This agreement included a non-compete provision prohibiting UGH from entering into a similar arrangement with anyone else.

In 2013, Ticer represented the Reed Parties in a state court action seeking and obtaining injunctive relief against Dr. Greg Lewis, Dr. Jack Chapman, Dr. Hassan Chahadeh, UGH, and related defendants (the "UGH Parties") who were marketing the Reed Procedure as their own through another entity called the "Advanced Migraine Relief and Treatment Center."  The Reed Parties later asserted claims for damages after discovering that UGH had paid over $1 million to Dr. Lewis and Advanced Migraine Relief and Treatment Center.  Griffith and Klemchuk served as Ticer's co-counsel in the state court lawsuit.  Ticer served as Griffith's co-counsel in a federal lawsuit filed by the Reed Parties against the UGH Parties.

Although Ticer initially represented the Reed Parties under a fee agreement that provided for an hourly fee, in March 2014, Ticer and the Reed Parties agreed to convert the arrangement into a contingent-fee agreement.  In August 2014, the Ugh Parties and Reed Parties entered into a mediated settlement agreement ("Global Settlement") in which the UGH Parties agreed to make installment payments totaling $2 million to Neuro Stim, with the first payment due on September 30, 2014.

Days after the mediation, Dr. Reed and Ticer's professional relationship ended, which led to a dispute over Ticer's fee. Ticer withdrew as the Reed Parties' counsel and intervened in the state court lawsuit to recover his fee. The Reed Parties responded by counterclaiming against Ticer for legal malpractice and breach of fiduciary duty. Ticer filed a third-party petition against Griffith and Klemchuk, seeking contribution in the event he was held liable on the Reed Parties' counterclaims. On September 30, 2014, the day their initial payment was due under the Global Settlement, the UGH Parties filed an interpleader petition in the state court lawsuit, seeking leave to deposit the amount of the initial payment into the court's registry. The trial court ordered the UGH Parties to deposit the entire amount into the court's registry, but the UGH Parties never complied with the order.

In December 2014, Ticer, the Reed Parties, Griffith, and Klemchuk entered into a written settlement agreement ("Agreement") regarding their fee dispute and their related state court claims. The UGH Parties were not parties or signatories to the Agreement, but the Agreement provided that the parties to the Agreement would direct UGH to make the initial payment under the Global Settlement in part to the Reed Parties and in part to Ticer. The Agreement further provided for mutual releases of the parties' claims against each other and for dismissal of the parties' claims after receipt of the payments set forth in the Agreement. In February 2015, UGH filed for bankruptcy, and in March 2015, the proceedings in the state court litigation were stayed. In 2016, the Reed Parties agreed to settle their claims against certain members of the UGH Parties, and a federal court ordered that the entire settlement amount be deposited into the court's registry and payment be stayed until resolution of the state court proceedings.

In September 2016, the trial court in the state proceedings lifted the abatement and severed the claims against the UGH Parties. In January 2017, the Reed Parties moved for summary judgment against Ticer on the affirmative defense of release, seeking dismissal of all of his claims

against them with prejudice. The arguments in the motion were based on the release provisions in the Agreement. Griffith and Klemchuk joined in the Reed Parties' motion for summary judgment. Ticer responded to the motions for summary judgment and filed a second amended petition in intervention in which he asserted additional claims for fraud and misappropriation of property for conduct alleged to have occurred after the signing of the Agreement. The trial court granted the motions for summary judgment and dismissed with prejudice all of Ticer's claims against the Reed Parties, Griffith, and Klemchuk. Ticer filed a motion for reconsideration, which the trial court denied. The appellees filed a joint motion for partial stay of all of the claims the Reed Parties asserted against Ticer and to sever into a new cause number Ticer's dismissed claims against appellees. The trial court entered orders granting appellees' joint motion for partial stay and severance. Ticer appealed the trial court's orders granting summary judgment and severance, the order denying his motion for reconsideration, and all other subsidiary orders.

## DISCUSSION

In his first issue, Ticer urges the trial court erred in granting appellees' traditional motions for summary judgment on the affirmative defense of release.

We review a trial court's order granting summary judgment de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.* at 681. Summary judgment granted on the basis of an affirmative defense will be affirmed only if the record establishes that the movant conclusively proved all elements of its affirmative defense as a matter of law. *Thomas v. Omar Invs., Inc.*, 156 S.W.3d 681, 683 (Tex. App.—Dallas

–4–

2005, no pet.).  An issue is conclusively established if reasonable minds could not differ about the conclusion to be drawn from the facts in the record.  *Hansen*, 525 S.W.3d at 681.

Ticer makes several different arguments to support his contention that the trial court erred in granting appellees' traditional motions for summary judgment on the affirmative defense of release, including an alternative argument that the Agreement is ambiguous as a matter of law.

Whether a contract is ambiguous is a question of law for the court.  *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  A contract is not ambiguous if it can be given a definite or certain legal meaning.  *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).  When construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument.  *Webster*, 128 S.W.3d at 229.  A contract, however, is ambiguous when its meaning is uncertain and doubtful or when it is reasonably susceptible to more than one meaning.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  When the provisions of a contract appear to conflict, we will attempt to harmonize the two provisions and assume the parties intended every provision to have some effect. *United Protective Servs., Inc. v. W. Vill. Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex. App.—Dallas 2005, no pet.).  If we are unable to harmonize the provisions and give effect to all clauses, and the contract is susceptible to more than one reasonable interpretation, we will find the contract is ambiguous.  *Id.*  When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue.  *Coker*, 650 S.W.2d at 394 (concluding an agreement was ambiguous on its own motion and reversing the trial court's grant of summary judgment).

We note that the Agreement contained several provisions that read together make the Agreement reasonably susceptible to more than one meaning.  First, Paragraph 2 of the Agreement addresses monetary compensation in several provisions that require (a) the parties to "direct the

UGH Parties to make the Initial Payment," (b) the Reed Parties to make a payment to Ticer *after* receiving payment from UGH, and (c) the Reed Parties to convey a security interest to Ticer in an escrow fund created pursuant to the Global Settlement.[1]  Paragraph 3 of the Agreement entitled Mutual Releases sets forth releases of claims against the Reed Parties, Ticer, Griffith, Klemchuk, and Ticer's associate Jennifer Johnson.  The mutual releases were made "[i]n exchange for the representations, mutual releases, warranties, undertakings and *the Monetary Consideration described in Section 2*."  Ticer argues the releases were only effective upon the payment of the required monetary consideration.  In response, appellees maintain that the release provisions in the Agreement were effective upon signing because the provisions state that Ticer "hereby RELEASES" the Reed Parties and Griffith.  However, Paragraph 5 of the Agreement entitled Dismissal provides that "[t]he Intervention, the Counterclaim and the Third-Party Action shall be dismissed with prejudice within three (3) days *following* the receipt of payments that are identified in paragraph 2(a)(i), (ii) and (iii) of this Agreement, with all Parties bearing their own attorneys' fees and costs of suit."  Thus, the dismissal provision appears to premise dismissal of the parties' claims upon receipt of the payments under Paragraph 2.  Additionally, Paragraph 4 of the Agreement entitled Other Conditions includes a provision that "[t]he Parties agree that all pending discovery in the Litigation between the Parties to this Agreement will be abated pending the

---

[1]     a. The Parties to this Agreement agree that they will each direct the UGH Parties to make the Initial Payment, as follows:

    i. within 24 hours after this Agreement is executed by all Parties, the UGH parties will pay or cause to be paid to the Reed Entities $300,000.00 . . .

    ii. within 24 hours after this Agreement is executed by all Parties, the UGH Parties will pay or cause to be paid to LOMAT the amount of $200,000.00 . . .

    iii. within 24 hours after the Reed Entities receive the payment identified in Paragraph 2(a)(i) above, the Reed Entities will pay or cause to be paid to LOMAT the sum of $18,836.09 by check for case expense reimbursement.

    b. Within 48 hours following receipt by the Reed Entities of the next settlement payment from the UGH Parties pursuant to the Global Settlement, the Reed Entities will pay to LOMAT the sum of $106,193.91 via check by hand delivery.

    c. The Global Settlement contemplates that a $200,000.00 escrow fund will be created. The Reed Entities also agree to grant and hereby assign and convey to LOMAT a security interest in this escrow fund to secure payment of the funds described in Paragraph 2(b) above. This security interest shall remain in effect until all monies contemplated under this Agreement to be payable to LOMAT are paid to LOMAT. LOMAT is entitled to first monies from this escrow until all amounts due LOMAT are paid. Once all amounts are paid to LOMAT, this security interest is released.

dismissal described in Paragraph 5, below." This provision appears to contemplate that no further proceedings in state court would take place until the parties' claims were dismissed with prejudice following the receipt of payments set forth in Paragraph 2.

We are unable to harmonize the foregoing provisions to give effect to all the provisions in the Agreement. *United Protective Servs., Inc.*, 180 S.W.3d at 432. Accordingly, we conclude the Agreement is ambiguous as to when the release provisions are effective, and thus summary judgment on the Agreement is improper because the interpretation of the Agreement is a fact issue. *Coker,* 650 S.W.2d at 394.

We sustain Ticer's first issue.

In his second issue, Ticer urges the trial court erred in granting summary judgment against Ticer on causes of action not addressed in the motions for summary judgment. Because our resolution of Ticer's first issue necessitates reversal of the trial court's summary judgment and thus reinstates Ticer's claims, we need not address his second issue. *See* TEX. R. APP. P. 47.4.

In his third issue, Ticer maintains the trial court abused its discretion by severing Ticer's claims against appellees and appellees' claims against Ticer. Appellees stated in their briefs that in the event this Court reversed the summary judgments, they would not oppose the severance order being vacated and the claims being reconsidered on remand. In light of this statement and the fact that the order for severance was premised on the dismissal of Ticer's claims, we sustain Ticer's third issue.

**CONCLUSION**

We reverse the trial court's judgement and order granting severance and remand this case for further proceedings consistent with this opinion.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

170721F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MARK A. TICER, D/B/A LAW OFFICE
OF MARK A. TICER, Appellant

No. 05-17-00721-CV          V.

REED MIGRAINE CENTERS OF
TEXAS, PLLC, KENNETH L. REED,
M.D., NEURO STIM TECHNOLOGIES,
LLC, CASEY GRIFFITH, AND
KLEMCHUK KUBASTA, LLP, Appellees

On Appeal from the County Court at Law
No. 2, Dallas County, Texas
Trial Court Cause No. CC-17-03338-B.
Opinion delivered by Justice Schenck,
Justices Lang and Fillmore participating.

In accordance with this Court's opinion of this date, we **REVERSE** the judgment of the trial court and its order granting severance and **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellant MARK A. TICER, D/B/A LAW OFFICE OF MARK A. TICER recover his costs of this appeal from appellees REED MIGRAINE CENTERS OF TEXAS, PLLC, KENNETH L. REED, M.D., NEURO STIM TECHNOLOGIES, LLC, CASEY GRIFFITH, AND KLEMCHUK KUBASTA, LLP.

Judgment entered this 4th day of December, 2018.